1  KING, HOLMES, PATERNO & SORIANO, LLP
   HOWARD E. KING, ESQ., STATE BAR NO. 77012
2  HKING@KHPSLAW.COM
   MATTHEW J. CAVE, ESQ. STATE BAR NO. 280704
3  MCAVE@KHPSLAW.COM
   ANDRÉS E. MONSERRATE, ESQ., STATE BAR NO. 324991
4  AMONSERRATE@KHPSLAW.COM
   1900 AVENUE OF THE STARS, 25TH FLOOR
5  LOS ANGELES, CALIFORNIA 90067-4506
   TELEPHONE:   (310) 282-8989
6  FACSIMILE:   (310) 282-8903

7  Attorneys for Plaintiffs MARC CHAN, LEI LI,
   STRONG WEALTH LIMITED and PACIFIC
8  SMILE LIMITED

9

10                   UNITED STATES DISTRICT COURT

11                 NORTHERN DISTRICT OF CALIFORNIA

12

13 | MARC CHAN, an individual; LEI LI, an | CASE NO.
   individual; STRONG WEALTH LIMITED, a |
14 | British Virgin Islands Company; PACIFIC | COMPLAINT FOR:
   SMILE LIMITED, a British Virgin Islands | 1. SECURITIES FRAUD UNDER
15 | Company, | THE SECURITIES AND
   | EXCHANGE  ACT OF 1934 §10B-5;
16 | Plaintiffs, | 2. FRAUD AND DECEIT;
   | 3. BREACH OF FIDUCIARY DUTY
17 | vs. | INCLUDING BREACH OF THE
   | DUTY OF LOYALTY AND
18 | ARCSOFT, INC., a California Corporation; | BREACH OF THE DUTY OF
   MICHAEL DENG, an individual; DANIEL | CARE;
19 | MACKEIGAN, an individual; TIMOTHY | 4. BREACH OF FIDUCIARY DUTY,
   LIN, an individual; HUATAI UNITED | INCLUDING BREACH OF THE
20 | SECURITIES COMPANY LIMITED, a China | DUTY OF CARE;
   Corporation; BEIJING HUATAI NEW | 5. BREACH OF DUTY OF CANDOR;
21 | INDUSTRY GROWTH INVESTMENT | 6. BREACH OF CONTRACT;
   FUND, a China Limited Partnership; | 7. USURPATION OF CORPORATE
22 | SHENZHEN HUATAI RUILIN EQUITY | OPPORTUNITY
   INVESTMENT FUND PARTNERSHIP, a | 8. IMPOSITION OF
23 | China Limited Partnership; WAVELET | CONSTRUCTIVE TRUST;
   CAPITAL MANAGEMENT, LTD., a Hong | 9. RESCISSION AND RESTITUTION
24 | Kong Corporation; and DOES 1-XX | 10. AIDING AND ABETTING
   | VIOLATION OF SECTION 10B-5
25 | Defendants. | AND CALIFORNIA COMMON
   | LAW FRAUD
26 |

27 |                                    | JURY TRIAL DEMANDED

28

5442.060/1498368.2

## STATEMENT OF THE CASE

1.      This case arises out of the fraudulent actions of a highly conflicted and self-interested CEO of a Silicon Valley company, Arcsoft, Inc. ("Company"), to coerce the Company's shareholders including Plaintiffs, to sell all of their stock in the Company to the CEO and his hand-picked financial partners at a tiny fraction of the actual value of that stock, while concealing material information about a planned initial public offering.

2.      The CEO executed this scheme by jamming through a "shareholder consent" with one day's notice, making false and misleading statements to the effect that Company's prospects were weak and deteriorating and by concealing the identity of the CEO's financial partner in the buyout of Plaintiffs shares in the Company ("the Buyout") and the Company's planned initial public offering ("IPO"). Immediately after consummation of the Buyout, the Company pursued this initial public offering, through which it was revealed that the CEO's primary financial partner in the Buyout was none other than the lead bookrunning manager in the planned IPO. Shortly following the Buyout, the CEO and his new financial partners took the Company public in Shanghai at a value over 30 times greater than the buyout price paid to Plaintiffs.

3.      The CEO executed this scheme by forcing an investment decision in one day, based on a campaign of false negative statements and suppression of the material financial information necessary for the Company's stockholders to make an informed decision. The CEO also designed and implemented a coercive process that prevented any meaningful due diligence, analysis or negotiation by the Company's shareholders, and precluded any meaningful deliberation by the Company's board of directors or exploration of superior alternatives.

4.      The Company's shareholders were not even told who was funding the Buyout or that it was an IPO underwriter. The shareholders were also not furnished necessary financial information that was required by the explicit terms of applicable investor rights contracts. Indeed, the shareholders were afforded vastly less information about their own Company than the positive information that was given to the CEO's hand-picked financial partners.

5.      The surviving company promptly went public in Shanghai China and immediately traded to a public market at a value that is over $3.5 billion, more than 30 times the value of the

1  Buyout price.

2      6.    As described in this complaint, in executing this transaction, the CEO and his

3  financing partners violated Section 10b-5 under the Securities Exchange Act of 1934 and

4  committed fraud under the California securities law, under California corporate law and under

5  long standing precedents concerning common law fraud.   The CEO also violated his fiduciary

6  duties, including the duty of care, the duty of loyalty, and the duty of candor.

7      7.    In approving the Buyout, the board of directors of the Company also breached their

8  fiduciary duties, including their duty of care, their duty of loyalty and their duty of candor.

9  Moreover the board of directors ignored all of their duties under well-settled principles of law that

10  govern a board's required conduct when considering and implementing the sale of a company or a

11  transfer of corporate control of the corporation.

12      8.    Subsequent to the closing of the Buyout, the CEO engaged in a concerted effort to

13  "cover his tracks" by seeking the execution of backdated fraudulent documents, including

14  soliciting a purported proxy, that sought to cover up and remedy, in hindsight, seven years of

15  improper lapses in corporate governance.   This unsuccessful effort to "un-ring the bell"

16  demonstrates actual knowledge by the CEO that the Buyout was executed in a legally flawed and

17  improper fashion and that the transaction is or might be void or voidable.

18      9.    The CEO's effort to obtain such backdated documents failed as Plaintiff Marc

19  Chan ("Mr. Chan") declined to execute the fraudulent backdated document.

20      10.    This Court's review of the transactions described herein, and its imposition of

21  appropriate remedies is urgently required.

22                                    **JURISDICTION AND VENUE**

23      11.    Jurisdiction is conferred by §27 of the 1934 Act. Certain of the claims asserted

24  herein arise under §§10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5.

25      12.    Venue is proper in this district pursuant to §27 of the 1934 Act. Many of the false

26  and misleading statements were made in or issued from this district.

27      13.    The Company maintains its principal executive office at 46605 Fremont Blvd.,

28  Fremont, CA 94538.  Many of the acts and conduct complained of herein, including the

KING, HOLMES,
PATERNO &
SORIANO, LLP

1  dissemination of materially false and misleading information to the investing public, occurred in
2  this district.

3      14.    In connection with the acts and conduct alleged in this complaint, defendants,
4  directly or indirectly, used the means and instrumentalities of interstate commerce, including, but
5  not limited to, the mails and interstate wire and telephone communications.

6      15.    Mr. Chan, a technology entrepreneur and investor, is a citizen of Canada, currently
7  residing in Hong Kong.  He is the duly authorized representative of each Plaintiff.

8      16.    Plaintiff Lei Li is Mr. Chan's wife, and until the consummation of the Buyout, was
9  a holder of Series B Preferred Stock of the Company.

10     17.    Plaintiff Strong Wealth Limited is an investment vehicle owned by family members
11 of Mr. Chan and, until the consummation of the Buyout, was a holder of Series A Preferred Stock
12 and Common Stock securities of the Company.

13     18.    Plaintiff Pacific Smile Limited is an investment vehicle owned by family members
14 of Mr. Chan and, until the Buyout, was a holder of Series A, Series B and common stock
15 securities of the Company.

16     19.    Together, these investment entities, all of which are affiliates and/or family
17 members of Mr. Chan, are referred to as the "Plaintiffs."  During all periods herein described,
18 Mr. Chan was and remains the duly authorized representative of each of the Plaintiffs in all
19 discussions with the Company and in all matters related to their ownership and investment therein.
20 Reference herein to Mr. Chan refers both to Mr. Chan personally, and to Mr. Chan as the
21 representative of the other affiliated Plaintiffs.

22     20.    The Company (sometimes referred to herein as "Arcsoft") is and at all times
23 described herein was a corporation incorporated under the laws of California, with its principal
24 place of business in Fremont, California.

25     21.    Defendant Mr. Michael Deng ("Mr. Deng") was the CEO of Arcsoft until the
26 consummation of the Buyout described herein, and is now the CEO of the surviving entity,
27 Wavelet Capital Management, Ltd., a Hong Kong company ("Wavelet").  Wavelet remains the
28 parent of Arcsoft.  Wavelet and its wholly-owned subsidiary Arcsoft, together with related entities,

1 are now a publicly traded corporation on the Shanghai Stock Exchange. Based on his holdings of
2 the stock acquired in the Buyout, and the current trading value of such stock, Mr. Deng is now a
3 billionaire.

4     22.     Defendant Daniel MacKeigan, was a member of the board of directors of Arcsoft,
5 which approved the Buyout.

6     23.     Defendant Timothy Lin, was a member of the board of directors or Arcsoft, which
7 approved the Buyout.

8     24.     Defendant Huatai United Securities Limited is a China company ("Huatai") was the
9 Joint Sponsor and Lead Underwriter of the Company's initial public offering in Shanghai.
10 Defendant Huatai is a well-known and successful investment banker in China focused on initial
11 public offerings.

12     25.     Defendant Beijing Huatai New Industry Growth Investment Fund is an affiliate of
13 Huatai and is a China limited partnership ("Huatai Fund").

14     26.     Defendant Shenzen Huatai Ruilin Equity Investment Fund Partnership is a China
15 limited partnership and is an affiliate of Huatai ("Huatai Ruilin").

16     27.     Defendants Huatai Fund and Huatai Ruilin provided a substantial portion of the
17 funds required for the Buyout.

18     28.     Wavelet is a Hong Kong Corporation which acquired 100 per cent of the shares of
19 the Company in the Buyout, thus becoming the parent corporation of the Company.

20     29.     Defendants Huatai, Huatai Fund and Huatai Ruilin are collectively referred to as
21 the "Huatai Defendants," and are defendants herein due to their active role in aiding and abetting
22 the fraudulent transactions described herein.

23     30.     The defendants referenced in paragraphs 21 to 23 above are referred to herein as
24 the "Individual Defendants."

25     31.     The Individual Defendants, because of their positions with the Company, possessed
26 the power and authority to control the disclosures and public and private statements to investors,
27 including to the Plaintiffs. They participated in or otherwise adopted and endorsed the statements
28 alleged herein to be misleading prior to or shortly after their issuance and had the ability and

1    opportunity to prevent their issuance or cause them to be corrected.

2    32.    Because of their positions with the Company, and their access to material non-
3    public information available to them, but not available to the Plaintiffs, the Individual Defendants
4    knew that the concealed facts specified herein had not been disclosed to and were being concealed
5    from the Plaintiffs and that the representations being made to the Plaintiffs were then materially
6    false and misleading. The Individual Defendants are liable for the false statements pleaded herein,
7    as well as for the material omissions described herein.

8    33.    The defendants sued herein as DOES I through X were, at all relevant times,
9    members of the board of directors of Arcsoft that, because of their positions with the Company,
10   possessed the power and authority to control the disclosures and public and private statements to
11   investors, including to the Plaintiffs. They participated in or otherwise adopted and endorsed the
12   statements alleged herein to be misleading prior to or shortly after their issuance and had the
13   ability and opportunity to prevent their issuance or cause them to be corrected. Because of their
14   positions with the Company, and their access to material non-public information available to them,
15   but not the Plaintiffs, the defendants sued herein as DOES I through X knew that the concealed
16   facts specified herein had not been disclosed to and were being concealed from the Plaintiffs and
17   that the representations being made to the Plaintiffs were then materially false and misleading. The
18   defendants sued herein as DOES I through X are liable for the false statements pleaded herein, as
19   well as for the material omissions described herein. Plaintiffs are ignorant of the identities of
20   defendants sued herein as DOES I through X, and therefore sue these defendants by such fictitious
21   names. Plaintiffs will amend this complaint to allege their true names and capacities when
22   ascertained..

23   34.    The defendants sued herein as DOES XI through XX were, at all relevant times,
24   individuals or entities that aided and abetted with the defendants to cause the improper and illegal
25   Buyout, IPO, breach of duties and the other violations of law alleged in this complaint. Plaintiffs
26   are ignorant of the identities of defendants sued herein as DOES XI through XX, and therefore sue
27   these defendants by such fictitious names. Plaintiffs will amend this complaint to allege their true
28   names and capacities when ascertained.

KING, HOLMES,
PATERNO &
SORIANO, LLP     5442.060/1498368.2

1     35.     Plaintiff will amend this complaint to allege their true names and capacities when

2 ascertained.

3     36.     Plaintiffs are informed and believe and thereon allege that, at all times herein

4 mentioned, each of the defendants sued herein was the agent and employee of each of the

5 remaining defendants and was at all times acting within the purpose and scope of such agency and

6 employment.

7                    **FACTUAL ALLEGATIONS**

8     37.     Mr. Chan met the management of Arcsoft in 1999. Mr. Chan had been a successful

9 entrepreneur in the technology industry. After a period of getting to know both Mr. Deng and the

10 Company's technology, Mr. Chan became enthusiastic about the prospects of the Company.

11     38.     The Company was not profitable and had limited capital resources. At the

12 Company's request, Mr. Chan agreed to participate in an investment round in the Company.

13 Absent such investment round, the Company would not have been unable to execute on its

14 business plan or continue operations.

15     39.     Over the next few years, the Company again requested additional financing from

16 Mr. Chan, and Mr. Chan agreed to provide such further financing, and did provide such needed

17 funding. In several of these investment rounds, the Company also obtained financing from

18 venture capital investors.

19     40.     On information and belief, given Mr. Chan's expertise in technology and the

20 electronics industry, his successful history as an entrepreneur, and his substantial contacts with

21 prospective customers of Arcsoft, the participation of Mr. Chan in these investment rounds helped

22 the venture capital funds become comfortable and supportive of investing in the Company and

23 enabled them to complete their due diligence processes favorably and efficiently.

24     41.     Thus Mr. Chan not only provided the Company with needed capital, he also

25 indirectly assisted and supported the Company obtaining needed capital from other investors.

26     42.     Over three years, Mr. Chan invested a total of approximately $4 million in cash in

27 the Company, and acquired shares of capital stock, representing approximately 13 percent of the

28 Company's capital stock, as determined on a fully diluted basis.

KING, HOLMES,
PATERNO &
SORIANO, LLP

5442.060/1498368.2

7

1  43. Following his investments, Mr. Chan spent substantial time and personal efforts in

2 helping the Company build its business.   He introduced the Company and its CEO to customers in

3 the electronics industry, and also introduced it to joint venture partners who over time helped the

4 Company monetize its technology and build its distribution network around the world.

5  44. As part of his investment in the Company, the Company executed an Investor's

6 Rights Agreement (the "Investor Rights Agreement"), which set forth various commitments by the

7 Company to provide timely and accurate information to investors.   Such commitments are

8 customary in venture capital investments in the Silicon Valley technology industry.

9  45. A critically important section of the Investor's Rights Agreement was Section 5.1

10 of the Agreement which provided the specific financial information that the Company was

11 required to furnish to Mr. Chan.   The required financial information included:

12  a. "Within 120 days after the end of each fiscal year, consolidated balance sheets of

13  the company and its subsidiaries, if any, as of the end of such fiscal year, and consolidated

14  statements of income and consolidated statements of cash flows of the company and its

15  subsidiaries, if any, for such year prepared in accordance with generally accepted

16  accounting principles, all in reasonable to tail and audited by a nationally recognized

17  independent public accountant selected by the company.

18  b. Within 45 days after the end of the first, second and third quarter of each fiscal

19  year, consolidated balance sheets of the Company and its subsidiaries, if any, as of the end

20  of such quarter and consolidated statements of income and cash flows of the Company and

21  its subsidiaries, if any, for such quarter, prepared in accordance with generally accepted

22  accounting principles and certified by the Chief financial officer of the company."

23  46. This information was important to Mr. Chan, and to all other investors who backed

24 the Company, because it was necessary to enable an investor to stay abreast of developments in

25 the Company so that they could make sound and informed investment decisions concerning the

26 Company when and if any such issues arose on short notice.

27  47. For a number of years, the Company complied with most of its duties to provide

28 financial information, but in 2014 and 2015 it stopped complying.   Instead, the CEO of the

1   Company began a pattern of obfuscation, concealment and "poor mouthing".

2       48.   Mr. Deng repeatedly told Mr. Chan and other investors that the business was not

3   doing well.  Moreover, the Company stated that audited financial statements were not available

4   due to delays by the Company's auditors and factors out of the Company's control.

5       49.   In 2016, Mr. Chan wrote to the Company notifying that it that the Company was in

6   breach of its legal obligations to provide timely financial statements.  In an email, Mr. Chan

7   stated:

8           "It has been a very long time since we received the last company
        financial report. Been a long time shareholder of the company, we

9           wish to be updated on the company status on a regular basis. It is the
        fiduciary duty of the company and board to provide us with financial

10          reports, thus I would be grateful if you could provide reports for
        year 2015 and year to date 2016 reports.

11          Thanks and regards,
        Marc Chan"

12

13      50.   The Company subsequently provided certain abbreviated incomplete and

14  misleading financial data, but the Company never again complied with its information obligations

15  to any material extent.  It never again provided any audited financial statements required by the

16  Investor Rights Agreement.

17      51.   Despite its reticence to provide the required financial information, the Company

18  did in fact have audited financial statements in its possession.  It simply chose to not provide them

19  to its investors as required by the Investor Rights Agreement.

20      52.   The ongoing breaches of the Investor Rights Agreement were material and caused

21  damage to Mr. Chan and other investors.  Such breaches were never cured.  Mr. Chan never

22  waived his rights to full compliance and to this information.

23      53.   In addition to its failure to provide required financial information, the Company

24  stopped providing ongoing and accurate information about its business prospects, financial

25  forecasts and major customer relationships.

26      54.   Indeed, the Company refused to disclose, and in fact suppressed, information

27  regarding its business dealings with even the very business partners that Mr. Chan had introduced

28  to the Company, and that had become important customers and counter parties for the Company.

1   55.   Despite ongoing efforts to learn of the status of these business relationships,

2   Mr. Chan never learned of such status, and to this day the Company has successfully concealed

3   this information.

4   56.   Section 600 of the California Corporations Code requires a California corporation

5   to hold each and every year an annual meeting of shareholders for the purpose of electing the

6   board of directors for the subsequent year.  The code requires that all shareholders must be

7   notified of the date and place of the meeting, and given at least 10 days' notice, to enable such

8   shareholder to attend, vote on directors and, if he wishes, to ask questions of management.

9   57.   On information and belief, the Company complied with this requirement

10   sporadically.  However, beginning in approximately 2011, the Company either stopped holding in

11   person annual meetings of shareholders at all, or if it did hold any such meetings, it did not give

12   notice of such meetings to Mr. Chan and he was thus kept unaware of when such meetings

13   occurred.

14   58.   Mr. Chan continued to seek to obtain information about the Company and its

15   business results and prospects.  When he contacted Mr. Deng, Mr. Deng repeatedly told Mr. Chan

16   that the Company was not doing well and was encountering weakness in its financial operations.

17   However the Company became evasive when asked to give specifics concerning its results.

18   59.   Eventually, Mr. Chan became discouraged about his investment in the Company.

19   The constant avoidance of forthright disclosure about the Company had caused Mr. Chan to doubt

20   the credibility of information given to him and the trustworthiness of management.

21   60.   In addition, Mr. Chan began to suspect that the CEO of the Company had engaged

22   in interested party transactions with counter parties or joint venture partners, which may have

23   enabled Mr. Deng to profit if the economics of those counter parties were favorable to those

24   parties, and unfavorable to Arcsoft.

25   61.   Mr. Chan reached out Mr. Deng to try to understand the nature and business

26   structure of Arcsoft's relationship with such parties.  However, as with other matters, Mr. Deng

27   was not forthcoming on these issues.

28   / / /

KING, HOLMES,
PATERNO &
SORIANO, LLP

**THE BUYOUT**

62.     In September 2017, Mr. Deng contacted Mr. Chan and told him there was an opportunity for him to sell his shares to a buyer that Mr. Deng had located.  Mr. Deng did not disclose the name or profile of such buyer or any information about it.

63.     Mr. Deng described the price that Mr. Chan would receive.  Mr. Deng again stated that the Company was not doing well and its prospects had deteriorated.

64.     Arcsoft also stated that it had lost a customer that was either its largest customer or was at least among its top customers.  The name of the customer was Samsung, which is the largest producer and seller of mobile phones in the world.

65.     In addition to the prior pattern of negative "poor mouthing statements", Mr. Deng indicated that there were no good alternatives for shareholders to achieve liquidity, such as through an initial public offering or a sale to a strategic buyer.  Mr. Deng urged Mr. Chan to support the Buyout in light of the Company's alleged difficulties.

66.     On September 17, 2017, the Company suddenly undertook to obtain the commitment of Mr. Chan and all other shareholders to the Buyout transaction with almost zero time to make a decision.

67.     The Company sent by email a package of information to Mr. Chan which included a cursory Information Statement (the "Information Statement") and a Merger Agreement that had allegedly been approved by the board of directors.

68.     The package of documents furnished by the Company included a purported Shareholder Action by Written Consent, and requested that Mr. Chan sign and return the Consent immediately.

69.     This request was highly unusual and irregular, as stockholder votes concerning important and complex matters such as a sale of the company are normally obtained with an in person shareholder meeting, following a solicitation of votes and proxies.

70.     In an approval of a vote by shareholder meeting, the California Corporate Code dictates that the shareholder meeting cannot be held for at least 10 days following notice of the meeting.

1  71.  This time period normally allows shareholders to have more time to consider and

2 deliberate concerning the vote, and to contact the board of directors to seek to get questions

3 answered, to retain counsel to assist in analyzing complex corporate documents, and to talk to

4 other shareholders about their questions and concerns.

5  72.  The Company avoided the opportunity for such shareholder self-protection and

6 self-help by demanding the return of Shareholder Consents without any delay.

7  73.  The Merger Agreement contained another structural element that was, on

8 information and belief, designed to eliminate the ability of shareholders to have sufficient time to

9 properly evaluate the terms of the Merger.  It included an imminent merger termination "drop

10 dead" date.

11  74.  On information and belief, it is usual for merger agreements to include such a drop

12 dead date, but such dates are normally set long in the future, often a year or more in the future,

13 which allows both sides to have an ample cushion of time to seek necessary consents and

14 approvals.  In this situation, the Arcsoft merger agreement however set the merger termination

15 "drop dead" date at September 30, 2017, a few days after shareholder consent was solicited.

16  75.  Thus, Arcsoft and its CEO were able to pressure its shareholders with the deadline

17 that if they did not approve the Buyout in the short period requested, the other party would have

18 the contractual right to walk away and abort the entire transaction.

19  76.  This created a dynamic where each shareholder, including Mr. Chan, would feel

20 that they might eliminate and destroy the possibility of any transaction for all shareholders if they

21 did not accede to the Company's demand for nearly instant approval of the transaction.

22  77.  In essence, the Buyout was set up as a "fire drill," wherein no shareholder was

23 afforded any reasonable ability to make an informed decision as to whether to give consent or to

24 oppose the transaction.

25        **THE INFORMATION STATEMENT**

26  78.  The Information Statement made a variety of alarming disclosures, but omitted

27 critical information necessary to enable shareholders to properly interpret such disclosures.

28  79.  The Information Statement disclosed that the Buyer of the Company was in fact a

KING, HOLMES,
PATERNO &
SORIANO, LLP

5442.060/1498368.2

1 newly formed company that was controlled by Mr. Deng, the CEO of the Company.  The

2 Information Statement disclosed that the buying entity had already been formed and that Mr. Deng

3 already owned 43% of the buying entity (the "Surviving Company").  It also disclosed that upon

4 consummation of the Buyout, Mr. Deng would then own a majority of the Surviving Company

5 and thus be in full control and hold a majority of the economic value of the Company.

6     80.     The Information Statement disclosed that the Company had not taken any efforts to

7 perform a market test or to explore or seek an alternative strategic or financial buyer who might

8 have offered a competitive offer or an alternative transaction which alternative transaction might

9 have provided a far higher price.

10     81.     The Information Statement also revealed that the structure of the Buyout precluded

11 any shareholders who did not want to sell to remain in the Surviving Company and thus

12 participate in the future success or equity appreciation of the Company.

13     82.     The Information Statement further disclosed that the neither the Company nor its

14 board had engaged the services of an investment banker or other financial advisor, which would

15 have enabled the board to both explore whether there was other acquisition interest in the

16 Company, and to understand and deliberate concerning the true inherent long term stand-alone

17 value of the Company.

18     83.     On information and belief, in the absence of such exploration of alternatives, and

19 such professional advice, there would be no reasonable way for the Company and its board of

20 directors to properly ascertain its true stand-alone value, or the possibility of achieving a superior

21 value in an alternative change of control transaction.

22     84.     The Information Statement included a two-page summary of certain incomplete and

23 misleading financial information concerning the 2016 fiscal year.  The Information Statement did

24 not include audited financial statements.

25     85.     The Company's failure to provide such audited financial statements occurred

26 notwithstanding the fact that statements in the Merger Agreement itself established that the

27 Company did in fact have such audited financial statements in its possession, and these had been

28 furnished to the Buyer and Mr. Deng's hand-picked financial partners.

KING, HOLMES,
PATERNO &
SORIANO, LLP

5442.060/1498368.2

COMPLAINT

86. In the Merger Agreement, the Company had contractually represented to the Buyer that such comprehensive audited Financial Statements were complete and accurate in all respects.

87. This set up the unfair, misleading and unjust dynamic where the buyer of the Company, the CEO and his hand-picked financial partners had full audited financial statements of the Company, but its very own shareholders who were told they must approve the transaction in one day or two days at most did not have the very same complete financial statements that were furnished to the counterparty.

88. The Information Statement did not disclose any information whatsoever concerning the financial parties who were providing the financing for the Buyout. It didn't disclose their names, their general identity or geographic base of operations.

89. The shareholders of the Company were intentionally and willfully kept in the dark concerning who such buying and investing entities might be. As Mr. Chan and the other shareholders would learn later, one of the primary investing entities was none other than a leading financial institution that became the Lead Underwriter and Sponsor of the Company's Initial Public Offering.

90. The Information Statement also failed to disclose what consideration Mr. Deng had invested, if anything, to obtain the 43% of the buying entity. On information and belief, Mr. Deng had either invested very little capital (or potentially nothing) to obtain this enormous financial interest, or had invested far less cash than his financial partners.

91. Thus, on information and belief, Mr. Deng's financial partners paid a far higher valuation to obtain their interest in the Surviving Company than that paid by Mr. Deng to obtain his large ownership, or that received by the selling investors of Arcsoft.

92. On information and belief, the difference in such valuation would represent a giant and undisclosed "commission" paid to Mr. Deng for betraying his own shareholders and delivering ownership and control of Arcsoft to the buyer group at a value that was vastly less than its true value.

93. The Information Statement stated falsely that Mr. Deng had been "recused" from the process of considering and executing the Buyout.

1    94.    However, Mr. Deng plainly was in fact actively involved in nearly every element of

2    negotiating, executing and soliciting approval of the Buyout.

3    95.    Indeed his own false and incomplete statements about the poor financial prospects

4    of the Company made to shareholders and to the board of directors of the Company formed the

5    primary motivating method employed to obtain purported consent to the Buyout.

6    96.    On information and belief, Mr. Deng also actively participated in board of directors

7    discussions and deliberations concerning the Buyout, solicited directors one on one,  and brought

8    direct pressure on board members to approve the Buyout.

9    97.    Contrary to his representations, Mr. Deng wasn't remotely "recused" from many

10   crucial elements of the board process leading up to the Buyout.  On information and belief,

11   discovery in this process will establish the full extent of the contamination, coercion and undue

12   influence employed by Mr. Deng to impose his self-motivated objectives on the board and the

13   shareholders and to achieve the wrongful approval of the Buyout.

14   98.    Mr. Chan did not believe he had time to hire counsel and to challenge the

15   transaction.  Faced with a coercive Buyout, Mr. Chan and his affiliates signed the Consent as was

16   demanded, on the very next day after receiving the document.

17   99.    Such signature was obtained through fraud, illegal solicitation and oppression as

18   described herein,  and the improper solicitation of such consent constituted a breach of trust and

19   fiduciary duty by Arcsoft, its controlling CEO and the board of directors.

20   **THE BACKDATED PROXY**

21   100.   In February 2018, Mr. Deng contacted Mr. Chan and said he wished to meet with

22   him.  Mr. Deng presented a document to Mr. Chan and anxiously asked Mr. Chan to sign it.

23   101.   In such document, Arcsoft sought to obtain a "backdated" signature of proxy,

24   purporting to transfer the entire voting control of all Mr. Chan's shares of stock to Mr. Deng.

25   102.   As odd and inappropriate such a document may be in any circumstance, such

26   document was striking in that it was dated 2011.  Thus the backdated document evidently sought

27   to cover up and remedy 7 years of improper or non-existent corporate approvals.

28   / / /

1  103. Mr. Chan was shocked by this request and did not sign or have his affiliates sign

2  such backdated document. (the "Backdated Proxy")  or any other such document.

3  104. On information and belief, the Backdated Proxy represented an effort of Mr. Deng,

4  Arcsoft and the Surviving Corporation to "paper the file" with fraudulent documentation, for the

5  purpose of covering up and concealing invalid and improper elements of the Merger and the prior

6  corporate governance of the Company.

7  105. On information and belief, the solicitation of Mr. Chan to sign the Backdated

8  Proxy, indicated that as late as February 2018,  the Company and  Mr. Deng understood that it did

9  not have a properly elected and constituted board of directors, or otherwise had severe and

10  disqualifying flaws in its corporate governance or approval process necessary for the valid

11  approval of the Buyout.

12  106. On information and belief, the Company and Mr. Deng falsely and improperly

13  represented to others, including perhaps Mr. Deng's new financial partners and other shareholders,

14  that Mr. Deng had obtained all legal and binding authority and power to execute necessary

15  corporate documents and actions that he had not in fact obtained.

16  107. On information and belief, the gap in corporate approval that caused Mr. Deng to

17  anxiously seek the execution of the Backdated Proxy may have undermined the validity of actions

18  to authorize the Buyout, and the Company in fact may not have had the required authority and

19  requisite approvals to consummate the Buyout.

20  108. In such event, on information and belief, the violation of corporate governance

21  requirements may be of such severity and magnitude that the actions to consummate the Buyout

22  were ultra vires and are thus void or voidable.

23  109. On information and belief, at the exact same time that Mr. Deng and Arcsoft were

24  telling Mr. Chan and other shareholders that the Company's prospects were weak and

25  deteriorating in order to solicit their consent to the Buyout, Mr. Deng was telling a far more

26  favorable story to the investment bank Huatai, its affiliated investment funds and other investors

27  which, unknown to Arcsoft's shareholders, had agreed to fund the Buyout.

28  / / /

KING, HOLMES,
PATERNO &
SORIANO, LLP

5442.060/1498368.2

16

COMPLAINT

110.   On information and belief, Mr. Deng and Arcsoft provided highly favorable and optimistic forecasts to Huatai and its affiliates that were never provided to the Arcsoft shareholders, and these optimistic forecasts and descriptions of favorable market opportunities induced Huatai and its affiliates to invest in the successor company at a favorable valuation that was much higher than the value received by the shareholders.

111.   Had Mr. Chan and the shareholders been informed that the financial partner Huatai was providing a substantial portion of the funding of the Buyout, Plaintiffs would not have executed a consent to the Buyout, as Mr. Chan would have understood that the prospects of a near term successful initial public offering were in fact quite high.

112.   Had Mr. Chan and the other shareholders been furnished the same information that Mr. Deng had given Huatai to induce its investment, Plaintiffs would not have executed the consent to the transaction as Mr. Chan would have been able to ascertain that the prospects of a successful near term initial public offering were in fact quite high.

113.   On Information and belief, throughout 2018, Mr. Deng and the Surviving Company continued their work in preparation for an in initial public offering.  The offering was executed and completed in the first half of 2019, and the Company's public market stock value promptly surged to over $4 billion.

114.   The Company currently has a public market value of approximately $3.5 billion, representing a value that is over 30 times greater than the value the shareholders of Arcsoft were paid for their shares.

115.   The trading in the shares is liquid with high daily trading volumes.  The support for the Company's stock includes favorable reports in the financial press, which includes the Company's successful inclusion in nearly all of the world's leading smart phone platforms.

116.   Contrary to the dire warnings given to induce the consent to the Buyout, the Prospectus and the financial press state that the Company's major customers still include Samsung.

/ / /

/ / /

**FIRST CAUSE OF ACTION**

**(Securities Fraud Under §10b-5 of the Securities Exchange Act of 1934)**

**(Against Defendants Arcsoft, Inc., Michael Deng and Directors Daniel MacKeigan and**

**Timothy Lin)**

117. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 to 116 above.

118. The Company made false and misleading statements with the purpose and effect of inducing Mr. Chan and the other shareholders to make an investment decision to sell their stock and to deliver their written consent to the Buyout. Such false statements included but are not limited to:

(a) The statements that the business and prospects of the Company had deteriorated.

(b) The statement that the Company's board had considered the merger in all material respects and had taken proper action to inform themselves of all material information necessary for a decision of such magnitude;

(c) The statement that Samsung had terminated its relationship with the Company.

(d) The statement that in the reasonable opinion of the board the Buyout was the best available alternative to deliver value for the Company's shareholders.

(e) The statement that Mr. Deng had validly recused himself from the board process culminating in the approval of the Buyout.

119. The Information Statement and the accompanying materials omitted to state material information necessary to make the statements therein not misleading. Material omissions include but are not limited to the following:

(a) The Information Statement omitted the audited financial statements of the Company, which audited financial statements were in the actual possession of the Company;

(b) The Information Statement omitted any disclosure whatsoever of financial results of the Company during the 8 months that had passed since the end of the prior fiscal year.

1    (c)    The Information Statement omitted any disclosure of the Company's major

2 customer relationships, including any information concerning the status of the Company's

3 relationship with Samsung, which disclosure would be necessary to make the Company's oral

4 statements about the loss of Samsung not misleading.

5    (d)    The Information Statement omitted any disclosure of the identities of the

6 financial investors who were funding the Surviving Company and providing the capital necessary

7 to fund the Buyout.

8    (e)    The Information Statement omitted any disclosure of the nature of the

9 financial investors, including inter alia, that one of the lead investors was an investment entity of a

10 leading investment bank and underwriter that was interested in promptly commencing work on the

11 initial public offering of the Company following the Buyout.

12    (f)    The information Statement omitted all of the information concerning the

13 Company's favorable business and prospects that had been furnished to the financial investors to

14 induce them to invest in the Company, and to underwrite and sponsor the Company's initial public

15 offering.

16    (g)    The Information Statement omitted any disclosure of the CEO's related

17 party transactions.

18    (h)    The information Statement omitted any disclosure of any valuation

19 methodology employed by the board in determining that the transaction was fair to shareholders.

20    (i)    The Information Statement omitted any disclosure of any inbound inquiry

21 or contacts that the Company may have had from other potential financial buyers or strategic

22 buyers, or other potential underwriters of an initial public offering concerning a potential

23 alternative transaction.

24    120.    The false statements made by the CEO, and the omission of necessary material

25 information by the Company were made with scienter, with knowledge of their falsity and and/or

26 a reckless disregard of their accuracy, and were made with an intent to induce reliance thereon.

27    121.    Mr. Chan and other shareholders did rely on such false information and material

28 omissions to their great financial detriment

KING, HOLMES,
PATERNO &
SORIANO, LLP

5442.060/1498368.2

1   122.   As a result of the foregoing, the Plaintiffs are entitled to damages in an amount to

2   be proven at trial, but in an amount not less than the difference between the value received in the

3   Buyout and the current fair market value of the stock if such plaintiffs had been enabled to retain

4   their stock and had not been fraudulently induced to give consent to the Buyout.

5   123.   Such amount is calculated to be in excess of $300 million, based on the value of

6   such stock as determined on the current market value of the Company based on its current trading

7   price.  Said defendants acted with malice, oppression and fraud, within the meaning of California

8   Civil Code Section 3294, with respect to Plaintiffs in connection with the foregoing, entitling

9   Plaintiffs to an award of exemplary, punitive damages against said defendants, in a sum according

10  to proof.

11  ## SECOND CAUSE OF ACTION

12  **(Fraud and Deceit Under California State Law)**

13  **(Against Defendants Arcsoft, Inc., Michael Deng and Directors Daniel MacKeigan and**

14  **Timothy Lin)**

15  124.   Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 to 123

16  above.

17  125.   The representations made by defendants were in fact false.

18  126.   Defendants had a duty to disclose the omitted facts and willfully failed to so

19  disclose such facts.  Defendant actively concealed such facts and suppressed disclosure thereof.

20  127.   When the defendant made the false representations, they knew them to be false, and

21  these representations were made by defendants with the intent to defraud and deceive Plaintiffs

22  and with the intent to induce plaintiff to act in the manner herein alleged.

23  128.   Plaintiffs, at the time these representations were made by defendants and at the time

24  plaintiffs took the actions herein alleged, were ignorant of the falsity of defendants false

25  representations and believed them to be true.

26  129.   When such representations were made and at the time plaintiff took the actions

27  herein alleged, Plaintiff in reliance on these representations were induced to take such actions .

28  Had plaintiff known the actual facts, they would not have signed the consent to the Buyout and

1 would not have taken further actions related thereto. Plaintiff's reliance on defendant's
2 representations was justified.

3     130.   The specific material facts omitted and concealed from Plaintiffs constitute
4 "Special Facts" within the meaning of the California doctrine of Special Facts, pursuant to which
5 Defendant's had an absolute duty to disclose such facts as such facts were uniquely within their
6 own knowledge and control.  Such Special Facts include, but are not limited to, the name and
7 identity of the Mr. Deng's partners, including the Huatai Defendants, which provided a substantial
8 portion of the funds for the Buyout.

9     131.   Such Special Facts also include the forecasts and favorable business information
10 which was furnished to the Huatai Defendants and the other financial investors, together with the
11 information furnished by the Huatai Defendants and the other financial investors, concerning their
12 own expectations of a likely favorable reception in the planned IPO.

13     132.   As a proximate result of defendant's fraud and deceit and the facts herein alleged,
14 Plaintiffs were damaged in the sum of the difference between the value of the shares received by
15 Plaintiffs and the value of such shares had Plaintiff continued to hold such shares to the current
16 date, which damage exceeds $300 million.

17     133.   In doing the acts herein alleged, defendants acted with oppression, fraud, and
18 malice, and plaintiff is entitled to punitive damages.

19                          **THIRD CAUSE OF ACTION**
20                 **(Breach of Fiduciary Duty, including Breach of the**
21                   **Duty of Loyalty and Breach of the Duty of Care)**
22                        **(Against Defendant Michael Deng)**

23     134.   Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 to 133
24 above.

25     135.   In taking the actions described herein, Mr. Deng breached his duty of loyalty and
26 duty of care owed to the shareholders of Arcsoft.

27     136.   While the Information Statement claims that Mr. Deng was "recused" from the
28 approval of the Buyout, on information and belief,  discovery in this case will establish that the

KING, HOLMES,
PATERNO &
SORIANO, LLP

5442.060/1498368.2                        21

1  actual facts are that Mr. Deng was directly involved in seeking, encouraging and soliciting the
2  approval of the board of directors of the transaction and that he in fact took substantial actions in
3  furtherance thereof.

4      137.    While the Information Statement claims that Mr. Deng was "recused" from the
5  approval of the Buyout, on information and belief,  discovery in this case will establish that the
6  actual facts are that Mr. Deng was directly involved in seeking, encouraging and soliciting the
7  shareholder consents to the transaction, and took substantial actions in furtherance thereof.

8      138.    By virtue of such actions, Mr. Deng violated his duty of loyalty and duty of care.

9      139.    By virtue of such breaches, Mr. Deng is liable to Arcsoft and the shareholders of
10  Arcsoft, including the Plaintiffs, for the damages and losses, including lost profits,  incurred
11  therefrom.  Mr. Deng acted with malice, oppression and fraud, within the meaning of California
12  Civil Code Section 3294, with respect to Plaintiffs in connection with the foregoing, entitling
13  Plaintiffs to an award of exemplary, punitive damages against Mr. Deng, in a sum according to
14  proof.

15                      **FOURTH CAUSE OF ACTION**

16    **(Breach of Fiduciary Duty, including Breach of the Duty of Care and Breach of the**
17                            **Duty of Loyalty)**

18             **(Against the Board of Directors of Arcsoft, including**
19          **Directors Michael Deng, Daniel MacKeigan and Timothy Lin)**

20      140.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 to 139
21  above.

22      141.    The Information Statement states that the board of directors did not retain a
23  financial advisor to advise it on the intrinsic value of the Company.

24      142.    As a result of such failure and other omissions, the board of directors failed to use
25  due care to inform itself of <u>either</u> the long term intrinsic value of the Company, or the short term
26  realizable value of the Company and in so failing, it violated its duty of care.

27      143.    The Information Statement reveals that the board of directors did not take any
28  actions to explore the possibility of an alternative superior bid for the Company.

KING, HOLMES,
PATERNO &
SORIANO, LLP

5442.060/1498368.2

COMPLAINT

144.    Applicable law establishes that in considering a change of control transaction in which shareholders interests will be exchanged for cash and thus terminated, a board of directors must use due care and thorough actions to explore the possibility of alternative transactions to ensure that the transaction to be approved is in fact the best transaction reasonably available and maximizes short term value.

145.    On information and belief, discovery in this case may establish that the board of directors did not retain a financial advisor to provide a fairness opinion in part because of their concern that such financial advisor might fail to agree that the Buyout was fair or was the best available financial alternative for the company and its shareholders.

146.    By failing to take any such actions, the board of directors violated its duty of care and violated its so called "Revlon Duties" to seek the highest available price.

147.    By failing to take sufficient actions to insulate its decision and deliberation process from the improper, unfair and oppressive participation of Mr. Deng, the board of directors violated both its duty of care and its duty of loyalty.

148.    As members of the board of directors of a California Corporation, the directors had a duty to take reasonable steps to ensure compliance with the California Corporation Law and the Bylaws of the Corporation, including the duty to hold annual meetings and provide proper notice thereof under Section 600 of the California Corporations Code, and under the Company's own bylaws.

149.    By failing to hold an annual meeting from 2011 to 2017, to seek a new election or re-election of directors at such a meeting, and to afford shareholders notice of such meetings and the opportunity to attend and receive such meetings, the board of directors effectively disenfranchised the Company's shareholders and deprived such shareholders of a normal and necessary mechanism of defending themselves against wrongdoing and self-dealing by the CEO.

150.    By failing to allow shareholders to attend such a meetings and receive a presentation as to the state of the business, and to afford them the opportunity to ask questions of management at such meetings, the directors of the Company placed the Company's own shareholders at a severe information disadvantage, which contributed materially to the ability of

1  the CEO to exercise his plan of shareholder oppression and to wrongfully seize ownership and

2  control of the Company through the Buyout.

3       151.   By failing to take reasonably actions to ensure that the Company complied with its

4  express obligations under the Investor Rights Agreement and other agreements, the Company

5  further contributed to such information disadvantage of its own shareholders.

6       152.   By supporting and allowing such serious corporate governance lapses, the board of

7  directors breached its fiduciary duties, including its duty of care and its duty of loyalty.

8       153.   Such lapses were willful, material, continuing and of long of duration.

9       154.   As a result of the foregoing breaches, the Individual Defendants are liable to

10  Plaintiffs in an amount to be proven at trial. The Individual Defendants acted with malice,

11  oppression and fraud, within the meaning of California Civil Code Section 3294, with respect to

12  Plaintiffs in connection with the foregoing, entitling Plaintiffs to an award of exemplary, punitive

13  damages against the Individual Defendants, in a sum according to proof.

14  **FIFTH CAUSE OF ACTION**

15  **(Breach of the Duty of Candor)**

16  **(Against Defendant Michael Deng and Arcsoft Board of Directors,**

17  **including Daniel MacKeigan and Timothy Lin)**

18       155.   Plaintiffs incorporate by this reference all of the allegations made in paragraphs 1

19  to 154 above.

20       156.   By virtue of their failure to disclose to Plaintiffs the material information actually

21  known by them about the Buyout which was omitted from the Information Statement, the

22  Individual Defendants violated their duty of candor that is held by all corporate directors and

23  executives when seeking approval for an in important corporate action. The Individual

24  Defendants are liable to Plaintiffs for all damages proximately caused by such breaches of duty.

25  The Individual Defendants acted with malice, oppression and fraud, within the meaning of

26  California Civil Code Section 3294, with respect to Plaintiffs in connection with the foregoing,

27  entitling Plaintiffs to an award of exemplary, punitive damages against the Individual Defendants,

28  in a sum according to proof.

1

## SIXTH CAUSE OF ACTION

2

### (Breach of Contract)

3

### (Against Defendant Arcsoft and the Individual Defendants)

4      157.    Plaintiffs incorporate by this reference allegations set forth in paragraphs 1 to 156

5   above.

6      158.    As a result of such failure and refusal to provide the annual audited financial

7   statements that are explicitly required by Section 5 of the Investor Rights Agreement, and the

8   quarterly certified financial statements required in such section, Defendant Arcsoft willfully

9   breached the Investor Rights Agreement.

10     159.    Such breach was material, prolonged, repeated and continual, and was never cured.

11     160.    Plaintiffs never waived such continued breach.

12     161.    As a proximate cause of such breach, Plaintiff was unable to be informed of the

13   business results and known trends in the operations of Arcsoft.

14     162.    As a result of such absence of information, Plaintiffs were prevented and rendered

15   unable to take action to defend themselves from Defendants' execution of the Buyout, or to seek

16   other remedies that it would have taken had they been properly informed.

17     163.    As a proximate cause of such breach, Plaintiffs were induced to sign the Consent to

18   the Buyout, and were damaged by virtue thereof, in an amount determined by the difference in

19   value of the funds received by the Plaintiffs in the Buyout, and the value of Plaintiffs equity

20   interest in Arcsoft had Plaintiffs held the shares to the current period.

21     164.    The breach of Investor Rights Agreement was induced by the coercive actions and

22   self-dealing motivations of Mr. Deng, and thus Mr. Deng is liable for the wrongful inducement of

23   such breach of contract by Arcsoft and for interference with Plaintiff's rights under such contract.

24     165.    The breach of the Investor Rights Agreement by Arcsoft was induced by the

25   approval and other actions of the board of directors supporting, enabling and in fact requiring

26   Arcsoft's material continual and willful breach of the Investor Rights Agreement, and thus the

27   Arcsoft board of directors are liable for inducing such breach and for the interference with

28   Plaintiffs rights under such contract.

**SEVENTH CAUSE OF ACTION**

**(Usurpation of Corporate Opportunity)**

**(Against Defendant Michael Deng)**

166.   Plaintiffs incorporate by this reference each of the allegations set forth in paragraphs 1 to 165 above.

167.   The opportunity to attract Huatai to invest in the Company at an attractive valuation and to promptly undertake a successful IPO of the Company, realizing great appreciation in the value of the capital stock of the Company, was an opportunity that belonged to the Company as a whole and to all of its shareholders, not to Mr. Deng solely.

168.   Every shareholder properly had the the right to participate in such transaction and the value creation afforded thereby.

169.   Mr. Deng had no right to seize and retain such opportunity only for himself, at least without a complete and full disclosure of all aspects of such opportunity to the board of directors and to all of the shareholders, and the receipt of an informed, considered and intentional waiver of such opportunity and the participation therein.

170.   By virtue of his concealment, deceit and other wrongful and oppressive actions which had the purpose and effect of enabling Mr. Deng to seize such opportunity for himself alone, Mr. Deng is liable for the usurpation and misappropriation of corporate opportunity under the doctrine of corporate opportunity under both California corporate law and well settled case law.

**EIGHTH CAUSE OF ACTION**

**(Imposition of Constructive Trust)**

**(Against Defendant Michael Deng)**

171.   Plaintiffs incorporate by reference the allegations in paragraph 1 through 170 above.

172.   Plaintiffs are informed and believe that the Mr. Deng has received stock ownership that rightfully belongs to Plaintiffs and/or the Company as a result of Mr. Deng's actions to misappropriate corporate opportunities and to fraudulently induce the transfer of corporate control

1 described herein.

2      173.   In the circumstances alleged, it is unfair, unjust, and inequitable to allow the

3 individual defendant Mr. Deng to retain any such proceeds.

4      174.   In the interests of fairness, justice, and equity, this Court can and should issue an

5 order and enter judgment imposing a constructive trust on the shares of capital stock owned by

6 Mr. Deng, which ownership was obtained through such wrongful actions.

7 **NINTH CAUSE OF ACTION**

8 **(Rescission and Restitution)**

9 **(Against All Defendants)**

10      175.   Plaintiffs incorporate by this reference the allegations in paragraphs 1 through 174

11 above.

12      176.   As a direct and proximate result of the individual defendants and the corporate

13 defendants' fraud and deceit, as set forth above, Plaintiffs are entitled to rescission of their forced

14 sale of shares pursuant to the Buyout as well as restitution damages, according to proof at trial.

15 **TENTH CAUSE OF ACTION**

16 **(Aiding and Abetting Violation of Section 10b-5 and California Common Law Fraud)**

17 **(Against the Huatai Defendants)**

18      177.   Plaintiffs incorporate by this reference each of the allegations set forth in

19 paragraphs 1 to 176 above.

20      178.   On information and belief, the Huatai Defendants assisted and encouraged all or

21 most aspects of Arcsoft's and Mr. Deng's scheme to achieve the Buyout through the use of an

22 accelerated demand for voting, material false statements and through the concealment of the

23 material facts described herein.

24      179.   On information and belief, the Huatai Defendants were specifically aware that their

25 identity and investment in the Surviving Company was not disclosed to the Arcsoft shareholders,

26      180.   On information and belief, the Huatai Defendants were further aware that the

27 disclosure of their identity and involvement in funding the Buyout would have indicated to the

28 Arcsoft shareholders that a near term IPO was viable and that therefore the Arcsoft shareholders

1  would be unlikely to approve the Buyout on the terms proposed or at all.

2       181.   On information and belief, the Huatai Defendants were aware that the audited

3  financial statements, interim financial statements and favorable business plans and forecasts

4  concerning the Company that they had been given to induce their own investment in funding the

5  Buyout had been withheld from the Company's very own shareholders when such shareholders

6  were urged to approve the Buyout.

7       182.   The Huatai Defendants participated in negotiating and structuring the Merger

8  Agreement such that it incorporated a "drop dead date" just days after the date of execution of the

9  Merger Agreement.

10       183.   On information and belief, the Huatai Defendants supported, participated in and

11  thus aided and abetted the scheme under which investors could not fairly or properly inform

12  themselves of the true facts concerning the Buyout, including having time to learn the identity of

13  the investors funding the Buyout.

14       184.   In assisting and participating in such scheme and approving such withholding of

15  material information, the Huatai Defendants aided and abetted the violations of Section 10b-5 and

16  Common Law Fraud herein described.

17       185.   The Huatai Defendants are thereby liable for aiding and abetting, and are thus liable

18  for the Arcsoft shareholders losses incurred thereby, including the losses incurred by Plaintiffs.

19       186.   The Huatai Defendants acted with malice, oppression and fraud, within the

20  meaning of California Civil Code Section 3294, with respect to Plaintiffs in connection with the

21  foregoing, entitling Plaintiffs to an award of exemplary, punitive damages against the Huatai

22  Defendants, in a sum according to proof.

23       WHEREFORE, Plaintiffs pray for judgment against defendants and each of them as

24  follows:

25      1.   For general damages;

26      2.   For damages in the amount to be proved at trial, but not less than the sum of $300

27  million dollars;

28      3.   For punitive damages in the amount to be proven at trial;

KING, HOLMES,
PATERNO &
SORIANO, LLP

1    4.    For rescission and restitution;

2    5.    For imposition of a constructive trust over the shares of the Company owned or

3    controlled by Mr. Deng;

4    6.    For costs of suit incurred herein; and

5    7.    For such other and further relief as the court may deem proper.

6

7    DATED:  September 18, 2019          KING, HOLMES, PATERNO & SORIANO, LLP

8

9                                       By:

10                                           HOWARD E. KING

11                                       Attorneys for Plaintiffs MARC CHAN, LEI LI,
                                         STRONG WEALTH LIMITED AND PACIFIC
12                                       SMILE LIMITED

13

14   **<u>DEMAND FOR JURY TRIAL</u>**

15   The Plaintiffs hereby demand a jury trial in the above-entitled action on all claims for relief

16   for which the Plaintiffs are entitled to a trial by jury.

17

18   DATED:  September 18, 2019          KING, HOLMES, PATERNO & SORIANO, LLP

19

20                                       By:

21                                           HOWARD E. KING

22                                       Attorneys for Plaintiffs MARC CHAN, LEI LI,
                                         STRONG WEALTH LIMITED AND PACIFIC
                                         SMILE LIMITED

23

24

25

26

27

28