UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARC CHAN, et al.,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>ARCSOFT, INC., et al.,<br><br>　　　　Defendants. | Case No. 19-cv-05836-JSW<br><br>**ORDER GRANTING MOTION FOR JUDGMENT ON THE PLEADINGS, DENYING MOTION TO DISQUALIFY PLAINTIFFS' EXPERT, AND DENYING MOTION TO SEAL**<br><br>Re: Dkt. Nos. 193, 194, 196 |

Now before the Court for consideration is the motion for judgment on the pleadings filed by Defendants ArcSoft, Inc. ("ArcSoft") and Michael Deng ("Deng") (collectively, "Defendants") and the motion to disqualify Plaintiffs' expert filed by Defendants. The Court has considered the parties' papers, relevant legal authority, and the record in the case, and it finds this matter suitable for disposition without oral argument. *See* N.D. Civ. L.R. 7-1(b). The Court HEREBY VACATES the hearings scheduled for August 18, 2023. For the following reasons, the Court GRANTS Defendants' motion for judgment on the pleadings and DENIES Defendants' motion to disqualify. The Court DENIES Plaintiffs' motion to consider whether another party's material should be sealed.

**BACKGROUND**

**A.　Motion for Judgment on the Pleadings.**

Plaintiffs Marc Chan, Lei Li, Pacific Smile Limited, and Strong Wealth Investment Limited ("Plaintiffs") allege that Defendants' alleged misconduct caused them to sell their stock in ArcSoft at an unfairly low price in a 2017 buyout (the "Buyout"). The case was originally filed on September 18, 2019, and after several rounds of motion to dismiss briefing and a motion for leave to amend, Plaintiffs filed the operative Corrected Third Amended Complaint ("CTAC"), which

asserts three claims: (1) a claim against all Defendants for allegedly fraudulent misrepresentations in connection with the Buyout; (2) a claim for breach of contract against ArcSoft; and (3) a claim against Defendant Michael Deng for breach of fiduciary duty. (*See* Dkt. 188, CTAC ¶¶ 348-376.)

As alleged in the CTAC, Plaintiffs Lei Li, Strong Wealth Investment Limited, and Pacific Smile Limited were ArcSoft shareholders at the time of the Buyout. (*Id.* ¶¶ 31-33.) Plaintiffs allege that Li, Strong Wealth Investment Limited, and Pacific Smile Limited were "affiliates or family members of Mr. Chan" and that Chan was the "duly authorized representative of each of the Plaintiffs" in all matters related to their ownership of ArcSoft shares. (*Id.* ¶ 34.) Plaintiffs do not allege that Chan himself held ArcSoft shares at the time of the Buyout.

Defendants have moved for judgment on the pleadings on the basis that Chan lacks standing to pursue direct claims against ArcSoft and Mr. Deng because he was not a direct owner of shares of ArcSoft at the time of 2017 Buyout.

**B.  Motion to Disqualify.**

To address Plaintiffs' theory that ArcSoft deceived Plaintiffs into selling their shares at an unfair price by failing to disclose plans to take ArcSoft public in China, Defendants sought to retain an expert in Chinese capital markets to discuss the potential of an IPO in China for ArcSoft. (Dkt. No. 193-1, Declaration of William Pao ("Pao Decl.") ¶ 3.) Counsel for Defendants, O'Melveny & Myers LLP ("OMM"), met with Zhiguo He, Ph.D in November 2022 and considered retaining him to testify in this case on this issue.

OMM worked with IMS Consulting & Expert Services ("IMS") to locate potential expert witness candidates. (Pao Decl. ¶¶ 4-5.) The relationship between OMM and IMS was confidential. (*Id.* ¶ 5; *see also* Dkt. No. 193-3, Declaration of Jennifer Weinrich ("Weinrich Decl.") ¶¶ 9-10.)

IMS identified Dr. He along with two others as potential Chinese capital-markets experts. On November 7, 2022, IMS held a call with Dr. He during which IMS shared with him general background about this case and a general overview of the expert qualifications Defendants sought. (Weinrich Decl. ¶ 11.) IMS's representative attests that she discussed the terms of IMS's relationship with him during the expert search process. (*Id.*)

2

Following that call, IMS sent Dr. He an email, which included an overview of the litigation and requested additional background. (*Id.* ¶ 12.) In that email, IMS set forth its standard terms relating to conflicts and confidentiality. (*Id.* ¶ 13.) The email contained a confidentiality provision stating:

> **Confidentiality.** You agree that all information regarding this case is confidential, and that you will not discuss any details of this matter with any persons, including but not limited to, opposing parties or their agents, other law firms, IMS' clients, and/or any other interested parties, without receiving prior permission from IMS.

(*Id.* ¶ 13.) The email concluded stating that "Your reply to this email denotes your acceptance of the content listed herein and your confirmation that the information you have provided is true and correct." *Id.* Dr. He responded to the email expressing his pleasure at having met and asking that his colleague be copied on future emails. (*Id.* ¶ 14.)

On November 23, 2022, after reviewing Dr. He's materials, OMM participated in a videoconference with Dr. He coordinated by IMS. (Pao Decl. ¶ 7.) The videoconference lasted approximately forty minutes, and OMM attests that they shared the case strategy and confidential views of Plaintiffs' claims and allegations about ArcSoft's alleged plans for an IPO. (*See id.* ¶¶ 8-10.) Prior to the videoconference, Dr. He received a copy of the operative complaint. (*Id.*) Defendants' counsel attests that counsel shared their "mental impressions and frank assessment of Plaintiffs' allegations" about ArcSoft's IPO plans. (*Id.* ¶¶ 9-10.) Counsel avers that they discussed their "views of confidential discovery material that could strengthen or undermine Plaintiffs' allegations" and solicited Dr. He's thoughts on their proposed strategy. (*Id.*)

Defendants' counsel subsequently met with and retained another candidate, Robin (Hui) Huang, Ph.D. (*Id.* ¶ 16.) On April 26, 2023, Defendants served their initial expert disclosures and Dr. Huang's expert report. (*Id.* ¶ 17.) On June 8, 2023, Plaintiffs disclosed that they had retained Dr. He as their rebuttal expert and served his report. (*Id.* ¶ 18.) IMS's representative attests that Dr. He never requested permission to discuss the case with anyone other than IMS or OMM. (Weinrich Decl. ¶ 19.)

Plaintiffs met with Dr. He on May 1, 2023, after receiving Defendants' initial expert disclosures. (Dkt. No. 197-1, Declaration of John Snow ("Snow Decl.") ¶ 4.) At the conclusion

3

of the call, Dr. He told Plaintiffs' counsel that he believed he had heard of the case before because an expert search firm may have contacted him about it, but he stated he did not believe he spoke with any of the lawyers that represented Defendants. (*Id.*) Dr. He stated that he had never been an expert before, was unfamiliar with the search process, and had not been retained by anyone. (*Id.*) He further stated he had not been shown any confidential documents. (*Id.*)

Plaintiffs retained Dr. He later that same day. (*Id.* ¶ 5.) The retention letter Dr. He signed stated that he had no conflict of interest that would prevent him from representing Plaintiffs and had not had any privileged discussions with anyone he believed represented Defendants. (*Id.*) Plaintiffs' counsel attests that Dr. He's earlier conversation with Defendants did not come up during any of their discussions about Dr. Huang's report. (*Id.* ¶ 6.) Dr. He drafted and finalized a rebuttal expert report, which was served on Defendants on June 8, 2023. (*Id.*)

On June 12, 2023, Defendants emailed Plaintiffs requesting the withdrawal of Dr. He's report based on the November 2022 meeting between Defendants' counsel and Dr. He. (Snow Decl. ¶ 7; *id.*, Ex. 5.) Defendants stated that although they did not retain Dr. He, they "confidentially discussed their interpretation of Plaintiffs' claims and Defendants' legal strategy…during the course of those privileged communications." (*Id.*, Ex. 5 at 7.)

After receiving Defendants' correspondence, Plaintiffs spoke with Dr. He, at which time he confirmed that he had met with Defendants' counsel in November 2022. (Snow Decl. ¶ 8.) He stated he did not have a strong recollection of the call and believed it was an informal consultation. (*Id.*; *see also* Dkt. No. 197-7, Declaration of Zhiguo He, Ph.D ¶ 5.) Based on that conversation with Dr. He, Plaintiffs declined to withdraw De. He's report, and Defendants moved to disqualify shortly after.

The Court will discuss additional facts as needed in the analysis.

## ANALYSIS

**A.     Applicable Legal Standards.**

**1.     Motion for Judgment on the Pleadings.**

Under Rule 12(c) of the Federal Rules of Civil Procedure, "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." A

4

motion for judgment on the pleadings challenges the legal sufficiency of the claims asserted in a complaint.  For the purposes of a Rule 12(c) motion, the Court must accept the allegations of the non-moving party as true.  *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1990) (internal citations omitted).  "Judgment on the pleadings is proper when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989) ("The principal difference between motions filed pursuant to Rule 12(b) and Rule 12(c) is the time of filing.  Because the motions are functionally identical, the same standard of review applicable to a Rule 12(b) motion applies to its Rule 12(c) analog.")

Generally, a court may not consider any material beyond the pleadings in ruling on a Rule 12(c) motion, but a "court may consider facts that are contained in materials of which the court may take judicial notice." *Heliotrope General, Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999) (internal quotations and citation omitted).  A court may also consider documents attached to the pleadings. *See Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001).  In this regard, a court need not accept as true any allegations that are contradicted by judicially noticeable facts. *In re Google Inc.*, No. 13-md-2430-LHK, 2013 WL 5423918, at *5 (N.D. Cal. Sept. 26, 2013) (citing *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000)).  A court is not required to assume the truth of conclusory allegations or of unwarranted inferences. *Id.* (citations omitted).

**2.     Motion to Disqualify.**

Federal courts have the inherent power to disqualify expert witnesses to protect the integrity of the adversarial process, protect privileges that otherwise may be breached, and promote public confidence in the legal system. *See Campbell Indus. v. M/V Gemini*, 619 F.2d 24, 27 (9th Cir. 1980) ("A district court is vested with broad discretion to make discovery and evidentiary rulings conducive to the conduct of a fair and orderly trial").  However, disqualification is a "drastic measure that courts should impose only hesitantly, reluctantly, and rarely." *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087, 1092 (N.D. Cal. 2004).

5

"Disqualification of an expert is warranted based on a prior relationship with an adversary if (1) the adversary had a confidential relationship with the expert and (2) the adversary disclosed confidential information to the expert that is relevant to the current litigation." *See id.* at 1092-93 (internal citations omitted). Generally, both factors must be present for disqualification to be appropriate. *Id.* at 1093. Courts additionally consider whether disqualification would be fair to the affected party and would promote the integrity of the legal process. *Id.* at 1093. The party seeking disqualification bears the burden of "demonstrating that it was reasonable for it to believe that a confidential relationship existed, and if so, whether the relationship developed into a matter sufficiently substantial to make disqualification or some other judicial remedy appropriate." *Kane v. Chobani, Inc.*, 12-CV-02425-LHK, 2013 WL 3991107, at *5 (N.D. Cal. Aug. 2, 2013).

**B.    The Court Grants Defendants' Motion for Judgment on the Pleadings.**

Defendants move for judgment on the pleadings on the basis that Plaintiff Marc Chan lacks Article III standing because he was not an ArcSoft shareholder at the time the Buyout occurred.

Article III of the Constitution requires courts to adjudicate only actual cases or controversies. *See* U.S. Const. art. III, § 2, cl. 1. "A suit brought by a plaintiff without Article III standing is not a 'case or controversy,' and an Article III federal court therefore lacks subject matter jurisdiction over the suit." *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004). To establish standing, a plaintiff must show he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). A plaintiff must clearly allege facts demonstrating each element. *Id.* "Because standing implicates the Court's subject matter jurisdiction, it may be challenged at any time and cannot be waived…" *Lindsey v. Starwood Hotels & Resorts WorldWide, Inc.*, No. CV023822GAFFMOX, 2008 WL 11363357, at *1 (C.D. Cal. June 13, 2008).

Defendants argue that Chan has not suffered an injury as required for Article III standing. The crux of Plaintiffs' claims is that they received an unfairly low price for their ArcSoft shares the Buyout. It is undisputed that Chan did not own shares of ArcSoft in 2017 and did not sell shares in the Buyout. Thus, Defendants contend that the alleged injury did not apply to Chan

6

because he did not hold shares and thus never received the allegedly unfair price.

In *Davis v. Yageo Corp.*, 481 F.3d 661 (9th Cir. 2007), which the Court finds instructive, the plaintiff brought a breach of fiduciary duty claim against the majority shareholder alleging that the majority shareholder controlled the board of directors and drove the company to bankruptcy, causing a loss of value in its stock. *Id.* at 675. The plaintiff had received shares of the company as part of a settlement agreement, but the settlement agreement was not finalized until after the injury alleged in the lawsuit occurred. *Id.* The Ninth Circuit held that the plaintiff did not have standing to sue because it did not own shares at the time that the damage to the value of the stocks was sustained and the injury—the breach of fiduciary duty—occurred. *Id.* Thus, plaintiff could not establish injury in fact as required for Article III standing. Like the plaintiff in *Davis*, Mr. Chan did not hold shares of ArcSoft at the time of the Buyout. As a result, he did not suffer any injury based on the purported decreased value of the stocks, and he lacks standing to pursue direct claims against Defendants.

Plaintiffs argue that Chan has standing as a beneficial owner of ArcSoft shares held by his wife and the other corporate shareholders. This argument is unpersuasive. As Defendants point out, California law "acknowledges the right of beneficial owners in two situations: (1) beneficiary of an employment benefit plan or of any entity defined in Section 3(a) of the federal Investment Company Act of 1940 (Cal. Corp. Code 711) and (2) a shareholder derivative action (Cal. Corp. Code 800)." *Dux Cap. Mgmt. Corp. v. Chen*, No. C 03-00540 WHA, 2004 WL 2472247, at *5 (N.D. Cal. June 30, 2004), *aff'd sub nom. Davis v. Yageo Corp.*, 481 F.3d 661 (9th Cir. 2007). This action does not arise under the Investment Company Act of 1940, and it is not a derivative action. Thus, Plaintiffs have failed to establish that Chan's purported status as a beneficial owner of ArcSoft shares is sufficient to confer Article III standing. For this reason, Plaintiffs' attempt to distinguish *Davis* based on Chan's beneficial ownership status is unpersuasive. *Davis* is on point. Chan was not an ArcSoft shareholder at the time of the alleged injury, and he thus lacks standing to assert direct claims against Defendants.

Plaintiffs' cited authorities do not compel a different result. *Patrick Alacer Corp.*, 167 Cal. App. 4th 995 (2008), is inapposite because that case discussed standing requirements in derivative

7

actions, which this case is not. 167 Cal. App. 4th at 1011-12. Similarly, *Silber v. Mabon*, 957 F.2d 697 (9th Cir. 1992) and the other federal securities cases involving shareholders of publicly traded companies are not applicable to this case, which involves state law claims and private companies. Plaintiffs also contend that Chan has standing to bring direct claims because of his purported community property interest in the ArcSoft shares his wife owned at the time of the Buyout. Plaintiffs offer no authority to support this argument, and the Court thus finds it unpersuasive.

For the foregoing reasons, the Court GRANTS Defendants' motion to dismiss Plaintiff Marc Chan for lack of standing.

**C.   The Court Denies Defendants' Motion to Disqualify Plaintiffs' Expert, Dr. He.**

**1.   Whether a confidential relationship existed.**

The Court first asks whether a confidential relationship existed between Defendants' counsel and Dr. He. "The party seeking disqualification of an expert witness bears the burden of demonstrating that it was reasonable for it to believe that a confidential relationship existed…and, if so, whether the relationship developed into a matter sufficiently substantial to make disqualification or some other judicial remedy appropriate." *Hewlett-Packard*, 330 F. Supp. 2d at 1093 (internal citations omitted). "The critical inquiry with regard to this factor is not whether there was a formal agreement between the adversary and the expert, but rather whether there was a relationship such that the adversary would 'reasonably . . . expect that any communication would be maintained in confidence.'" *CreAgri, Inc. v. Pinnaclife Inc.*, No. 5:11-CV-06635-LHK, 2013 WL 6700395, at *3 (N.D. Cal. Dec. 18, 2013) (quoting *Hewlett-Packard*, 330 F. Supp. 2d at 1093). When making this determination, courts consider a number of factors, including the length of the relationship and number of meetings between the adversary and the expert, whether the expert was retained to assist in litigation, whether there was a formal confidentiality agreement in place, whether the expert was paid a fee, and whether the expert derived any of his specific ideas from work done under the direction of the retaining party. *See id.*, at *3; *Hewlett-Packard*, 330 F. Supp. 2d at 1093. No single factor is dispositive. Thus, there is no per se rule that an expert must be disqualified merely because he signed a confidentiality agreement with the adversary. *See*

*Hewlett-Packard*, 330 F. Supp. 2d at 1094.  Ultimately, disqualification depends not on whether there is a confidentiality agreement in place, but whether the expert actually began reviewing confidential factual information and theories concerning litigation.  *See Hewlett-Packard*, 330 F. Supp. 2d at 1093.  The party seeking to disqualify the expert bears the burden of establishing the existence of a confidential relationship.  *CreAgri, Inc.*, 2013 WL 6700395, at *3 (citing *Mayer v. Dell*, 139 F.R.D. 1, 3 (D.D.C. 1991)).

Upon consideration of the above factors, the Court finds it was not reasonable for Defendants' counsel to believe it had a confidential relationship with Dr. He.  Dr. He met with Defendants' counsel on one occasion for less than an hour.  Dr. He was never retained to assist Defendants in the litigation, was never paid a fee, and never entered into a formal confidentiality agreement with Defendants.  The only document Defendants gave to Dr. He was the operative complaint.  Defendants' counsel does not claim that they requested confidentiality from Dr. He during the meeting or at any other time.  Defendants argue that Dr. He's response to IMS's email constituted a confidentiality agreement.  However, Dr. He's implicit acceptance of *IMS's* terms of confidentiality is not clear evidence of a formal confidentiality agreement between *OMM* and Dr. He.  Even if it was, that fact alone is not dispositive in determining whether a confidential relationship existed.  Thus, the email from IMS to Dr. He does not establish a reasonable expectation of a confidential relationship between OMM and Dr. He.

Defendants rely heavily on *Shadow Traffic Network v. Superior Court*, 24 Cal. App. 4th 1067 (1994).  In that case, the plaintiff's attorneys met with an accounting firm about the possibility of being an expert witness in the lawsuit.  The attorneys had several conversations with the accounting firm.  *Id.* at 1073.  At the beginning of one meeting, the attorney told the accounting firm representatives that everything they would be discussing was confidential and should not be disclosed, to which the accounting firm stated their agreement.  *Id.*  The attorneys then proceeded to discuss litigation and trial strategies and the expected testimony from the accounting firm.  *Id.*  The law firm decided not to retain the accounting firm, and when opposing counsel later attempted to retain the same firm, the law firm moved for disqualification, which the court granted.  *Id.* at 1084.

Unlike in *Shadow Traffic*, Defendants' counsel did not directly raise the issue of confidentiality with Dr. He or seek his acknowledgement that their conversation would remain confidential. Defendants' counsel avers that "he understood and had no occasion to doubt that [the] conversation with Dr. He was confidential" because "based on prior…experience, [he] understood IMS had a confidential relationship with [OMM]" and that "IMS confirmed that Dr. He was conflict-free and that he would keep any communications confidential." (Pao Decl. ¶ 13.) The Court cannot conclude, on this basis, that counsel's belief that a confidential relationship existed was reasonable. Indeed, given counsel's insistence that they shared sensitive and confidential information with Dr. He, it seems unreasonable and unlikely that counsel would not have explicitly addressed confidentiality with Dr. He during the meeting especially given he lacked any prior expert witness experience, and instead solely relied on prior experience a confidentiality agreement with a third-party consulting firm.

Defendants other cited cases are also factually distinguishable. The Court in *M&T Bank v. Worldwide Supply LLC*, No. CV206378MCAMAH, 2022 WL 16743689 (D.N.J. June 28, 2022), found it was objectively reasonable to believe a confidential relationship existed where counsel discussed their theory of the case and provided to the expert at her request a summary of counsel's assessment of the claims, which was designated "ATTORNEY WORK PRODUCT – PRIVILEGED AND CONFIDENTIAL." *M&T Bank*, 2022 WL 16743689, at *4. In *Calendar Rsch. LLC v. StubHub, Inc.*, No. 2:17-cv-04062-SVW-SS, 2017 WL 10378337 (C.D. Cal. Sept. 22, 2017), the court determined it was reasonable to believe a confidential relationship existed where the expert executed a retainer that included a formal confidentiality agreement, and where the relationship between the party and the expert lasted several months and involved multiple rounds of feedback and questioning. *Calendar Rsch. LLC*, 2017 WL 10378337, at *2.

Based on the facts in the record, the Court concludes that Defendants' single meeting with Dr. He was "only an initial discussion, the goal of which was to decide whether [OMM] wanted to employ [Dr. He] and whether [Dr. He] wanted to work for [OMM]." *Hewlett-Packard*, 330 F. Supp. 2d at 1096. Defendants have not shown it was objectively reasonable for them to believe that a confidential relationship existed with Dr. He.

### 2. Whether the information disclosed was confidential.

Because the Court has concluded that Defendants lacked an objectively reasonable basis to believe that a confidential relationship existed with Dr. He, it need not address the issue of disclosure of confidential information. *See Hewlett-Packard*, 330 F. Supp. 2d at 1093 (noting that "if only one of the two factors is present, disqualification is likely inappropriate."). However, even if the Court believed that there was a reasonable basis for Defendants to believe they had a confidential relationship with Dr. He, Defendants have not established that they disclosed confidential information relevant to this case during that relationship.

"Confidential information is defined as information of either particular significance or [that] which can be readily identified as either attorney work product or within the scope of the attorney-client privilege, including discussions of a party's strategy litigation, a party's view of the strengths and weaknesses of each side, and the role of each of a party's experts to be hired and anticipated defenses." *Kane v. Chobani, Inc.*, 12-CV-02425-LHK, 2013 WL 3991107, at *5 (N.D. Cal. Aug. 2, 2013) (quotations and alterations omitted). Confidential communications may include discussions related to litigation, such as strategy, types of experts and their planned roles, and the strengths and weaknesses of each side's case. *Hewlett-Packard*, 330 F. Supp. 2d at 1094. However, "[c]ourts have held that technical information as opposed to legal advice is not considered confidential" for the purposes of this analysis. *CreAgri*, 2013 WL 6700395, at *5 (citation omitted). The party seeking disqualification bears the burden of demonstrating that confidential information was exchanged by "point[ing] to specific and unambiguous disclosures that if revealed would prejudice the party." *Hewlett-Packard*, 330 F. Supp. 2d at 1094 (citations omitted).

Defendants rely on the declaration of Defendants' lead counsel, William Pao, to establish that it disclosed confidential information protected by attorney-client privilege and work product doctrine to Dr. He. Pao attests that during the November 23, 2022, meeting with Dr. He, counsel discussed case strategy, defense counsel's mental impressions of Plaintiffs' allegations relating to the alleged plan to go public, counsel's views on the strengths and weaknesses of those allegations, Defendants' plan to respond to those allegations, and Defendants' views on how

confidential information in discovery could be used to strengthen or undermine Plaintiffs' allegations. (Pao Decl. ¶10.)

The Court finds Defendants' reliance on Pao's declaration insufficient to meet their burden. The declaration does not include details or specific facts about the purportedly confidential disclosures, and the Court finds the assertions are too general and conclusory to satisfy Defendants' burden. Defendants have also not explained how the revelation of any such confidential information would prejudice them. By the time Plaintiffs' counsel met with Dr. He, Defendants had already disclosed their expert report prepared by, which presumably revealed Defendants' views of Plaintiffs' allegations and strategy for opposing them. Moreover, Defendants have not identified any information that was shared with Dr. He that was not subsequently disclosed in their April 26, 2023 expert report.[1] On this record, Pao's declaration supports the conclusion that the meeting with Dr He was an initial expert vetting discussion, not a confidential conversation about the pending litigation.

Accordingly, the Court finds that Defendants have not met their burden to show that they disclosed confidential information to Dr. He that is relevant to this litigation and that if revealed would prejudice them.

### 3. Fundamental fairness and policy considerations.

The Court also asks whether disqualification would be fair to the affected party and would promote the integrity of the legal process. In considering this factor, the Court considers whether other experts would be available if the expert at issue were disqualified and whether disqualification at this stage of litigation would likely disrupt judicial proceedings. *See Hewlett-Packard*, 330 F. Supp. 2d at 1095. "Consideration of prejudice is especially appropriate at late stages in the litigation, at which time disqualification is more likely to disrupt the judicial proceedings." *Life Techs. Corp. v. Biosearch Techs., Inc.*, No. 12-0852, 2012 WL 1604710, at

---

[1] Defendants contend they should not be required to disclose the actual information contended to be confidential to protect against further exploitation. However, if Defendants were concerned that providing additional details about the confidential disclosures, they could have requested leave to submit further evidence of the confidential disclosures *in camera* for the Court's inspection, but they did not.

*10 (N.D. Cal. May 7, 2012).

Considerations of fairness favor denying the motion to disqualify under these circumstances. The parties are about to begin summary judgment briefing and that hearing is set for November 2023. Expert discovery closed on July 28, 2023. Even if the Court reopened expert discovery, it is not clear that Plaintiffs could secure another expert witness in this field in time to prevent further delays in this proceeding, which has already been pending since 2019. Thus, disqualification at this stage would likely disrupt judicial proceedings and could prejudice Plaintiffs.

With regard to the integrity of the legal process, the Court believes that disqualifying Dr. He based on a relatively brief introductory conversation with counsel might incentivize parties in other cases to engage in early vetting conversations with multiple experts for the sole purpose of preventing their opponents from hiring these experts. Thus, this factor favors denial.

The Court also notes that had counsel on both sides performed their duties with more diligence, this situation likely could have been avoided. Defendants' counsel should have clearly expressed their expectations regarding confidentiality to Dr. He and taken greater efforts to confirm his understanding given he was a first-time expert. By the same token, Plaintiffs' counsel should have more thoroughly questioned Dr. He prior to retaining him once he told them that he had discussed this case with an expert search firm. The Court does not countenance what it views as a lack of diligence in the vetting process by counsel on both sides. However, because both sides contributed to the present situation, the Court does not find the behavior of counsel meaningfully tips the scale in either direction.

Based on the foregoing, and keeping in mind that disqualification is "drastic measure" to be used "hesitantly, reluctantly, and rarely," *Hewlett-Packard*, 330 F. Supp. 2d at 1092, the Court DENIES Defendants' motion to disqualify.

**D.    The Court Denies the Motion to Seal.**

Plaintiffs filed an administrative motion to consider whether Defendants' material should be sealed relating to materials filed in support of Plaintiffs' opposition to Defendants' motion to disqualify. Plaintiffs seek to seal information designed by Defendants as "Confidential" pursuant

13

to the parties' Stipulated Protective Order. Defendants have filed a response stating that they do not object to the public filing of the information. (*See* Dkt. No. 200.) Accordingly, the Court DENIES the motion to seal.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion for judgment on the pleadings and DENIES Defendants' motion to disqualify Plaintiffs' expert. Plaintiffs' motion to seal is DENIED.

The motion hearings scheduled for August 18, 2023, are HEREBY VACATED.

**IT IS SO ORDERED.**

Dated: August 8, 2023

_____
JEFFREY S. WHITE
United States District Judge