UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARC CHAN, et al.,<br><br>                   Plaintiffs,<br><br>          v.<br><br>ARCSOFT, INC., et al.,<br><br>                   Defendants. | Case No.  19-cv-05836-JSW<br><br>**ORDER RESOLVING CROSS-MOTIONS FOR SUMMARY JUDGMENT AND RESOLVING MOTION TO EXCLUDE EXPERT TESTIMONY**<br><br>Re: Dkt. Nos. 204, 205, 210, 211, 212, 215 |

Now before the Court for consideration are the cross-motions for summary judgment, filed by Plaintiffs Lei Li, Strong Wealth Investment Limited, and Pacific Smile Limited (collectively, "Plaintiffs") and Defendants ArcSoft, Inc. ("ArcSoft") and Michael Deng ("Deng," and collectively, "Defendants"). (Dkt. Nos. 204, 210.) Also before the Court is Defendants' Motion to Exclude the Report and Testimony of David M. Locala. (Dkt. No. 212.) The Court has considered the parties' papers, relevant legal authority, the record in this case, and oral argument.[1]

For the following reasons, the Court DENIES the Motion to Exclude the Report and Testimony of David M. Locala. Further, the Court GRANTS, IN PART, and DENIES, IN PART, Plaintiffs' Motion for Partial Summary Judgment. Finally, the Court DENIES Defendants' Motion for Summary Judgment.

## BACKGROUND

Unless otherwise noted, the following facts are undisputed.

At all relevant times, Deng was the Chief Executive Officer and a member of the board of directors of ArcSoft. Plaintiffs owned stock in ArcSoft until October 2017, when ArcSoft and its

---

[1] The Court has also reviewed and considered the supplemental authorities filed by the parties. (Dkt. Nos. 224, 225.)

shareholders consummated a buyout of the company to an entity majority-owned by Deng.

Prior to the buyout, Deng and Dismissed Plaintiff Marc Chan had telephone conversations relating to the health of ArcSoft and Deng's efforts to find a buyer. The parties dispute the nature, number, and timing of the calls. Chan states that they had multiple conversations in which Deng warned Chan that ArcSoft was in dire straits and that a buyout was the only way to stave off collapse; Deng states that he would not have told Chan that ArcSoft's prospects were negative, because he was optimistic about its future.

On September 18, 2017, Deng emailed Chan a preview of the email and documents that ArcSoft would send to shareholders to solicit their approval for the buyout. (Dkt. No. 204-20, Ex. 16.)

The next day, the email address "Share-Admin@arcsoft.com" sent the message to the shareholders, with Chan cc'd. (Dkt. No. 210-37, Ex. II.) The email contained Deng's signature block, and it included a Shareholder Consent form, an "Information Statement," and a copy of the merger agreement. (*Id.*) The Information Statement disclosed that Deng had a conflict of interest, and it further stated that Deng was recused from board discussion and approval with respect to the buyout. (*Id.*) It also provided notice of dissenters' rights under California law. (*Id.*) Plaintiffs signed the consent forms within a day of receipt.

Defendants did not provide Plaintiffs with quarterly financials, audited financials for 2016, projections for ArcSoft's future revenues, or a fairness opinion. Defendants did not disclose that ArcSoft had entered into a number of deals relating to its dual-cam technology with major mobile phone developers.

On September 22, 2017, Defendants executed an "ArcSoft Restructuring Agreement" with a number of corporate entities, including a major Chinese investment entity called Huatai. (Dkt. No. 204-14, Ex. 11.) The agreement provided, among other things, that Huatai would obtain a large minority stake in the post-buyout ArcSoft.

The buyout was consummated on September 26, 2017. (Dkt. No. 204-50, Ex. 42.) In July 2019, ArcSoft's new corporate parent went public on the Shanghai Stock Exchange's STAR Market.

Plaintiffs filed their Corrected Third Amended Complaint on April 4, 2023. Plaintiffs bring three claims for relief: (1) Fraud, Deceit, and Concealment under California law; (2) Breach of Fiduciary Duty, including Breach of the Duties of Loyalty, Care, and Candor as to Deng; and (3) Breach of Contract as to ArcSoft for violation of Section 2.1 of the Investor Rights Agreement ("IRA"). Plaintiffs seek general damages, damages not less than $300 million, punitive damages, rescission and restitution, imposition of a constructive trust over the shares of the Chinese company owned or controlled by Deng, and for costs of the suit.

The Court will address additional facts as necessary in its order.

## REQUESTS FOR JUDICIAL NOTICE

Plaintiffs request the Court take judicial notice of a printout of historical rates for exchanging Chinese RMB (Yuan) into U.S. dollars from January 3, 2000 through July 28, 2023, from the Federal Reserve's website, at https://www.federalreserve.gov/releases/h10/hist/dat00_ch.htm [permalink https://perma.cc/A69S-C5TT]. Under Federal Rule of Evidence 201, the Court may take judicial notice of an adjudicative fact if it is "not subject to reasonable dispute." Fed. R. Evid. 201(b). A fact is "not subject to reasonable dispute" if it is "generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Id.* "Exchange rates listed on the Federal Reserve's system are a 'fitting subject of a request for judicial notice.'" *Krystal Inc. v. China Untied Transport, Inc.*, No. 5:16-cv-02406-RSWL, 2017 WL 4339343, at *2 (C.D. Cal. Sept. 26, 2017) (quoting *HostLogic ZRT v. GH Int'l, Inc.*, No. 6:13-cv-982-Orl-36KRS, 2014 WL 2968279, at *9 (M.D. Fla. Jun. 10, 2014)). Accordingly, the Court GRANTS Plaintiffs' Request for Judicial Notice of the historical rates of exchange for Chinese RMB (Yuan) into U.S. dollars.

Plaintiffs also request the Court take judicial notice of the California Senate Insurance, Claims and Corporations Committee (Senator Alan Robbins, Chairman) Analysis of Senate Bill No. 1464 from the 1987-1988 Regular Session, hearing date May 6, 1987. Defendants do not object to Plaintiffs' request, but they challenge the analysis's relevance and trustworthiness. (*See* Dkt. No. 210, at 52-53.) The Court will take judicial notice of the bill analysis, but it will not accept the truth of the matters asserted therein. *See Lee v. City of Los Angeles*, 250 F.3d 668, 689

United States District Court
Northern District of California

1 (9th Cir. 2001) (holding "matters of public record" are judicially noticeable, but that "a court may

2 not take judicial notice of a fact that is 'subject to reasonable dispute.'").  Subject to the foregoing,

3 the Court GRANTS Plaintiffs' Request for Judicial Notice of the bill analysis.

4 **DEFENDANTS' *DAUBERT* MOTION**

5 Defendants move to exclude portions of the expert testimony and report of Plaintiff's

6 expert David M. Locala.  As a preliminary matter, the Court will not apply Civil Local Rule 7-3 to

7 prohibit the separate filing of motions to exclude expert testimony.  Defendants' motion is fully

8 briefed and ripe for decision.

9 Mr. Locala has a Bachelor of Science in Commerce, with Distinction, with a concentration

10 in Finance from the McIntire School of Commerce at the University of Virginia.  (Dkt. No. 212-3,

11 at 3.)  Mr. Locala received his Master's in Business Administration, with Distinction, from

12 Harvard Business School.  (*Id.*)  Mr. Locala began his career in mergers and acquisitions with

13 Morgan Stanley & Co. in 1989.  (*Id.*)  In 1998, Mr. Locala worked in mergers and acquisitions at

14 Lazard Freres & Co., an M&A advisory company.  (*Id.*)  For the ten years thereafter, Mr. Locala

15 was a Managing Director in the Technology M&A Group at Deutsche Bank Securities Inc.,

16 including three years as the Co-Head of the group.  (*Id.*)  Between 2015 and 2022, he served as the

17 Global Head of Technology M&A at Citigroup Global Markets Inc.  (*Id.*)  At some point, Mr.

18 Locala also worked at Goldman Sachs & Co. and Montgomery Securities.  Mr. Locala holds the

19 following FINRA licenses: Series 7, Series 63, and Series 24.  (*Id.* at 5.)  Over the last thirty years,

20 Mr. Locala advised on over 100 announced mergers and acquisitions of both public and private

21 companies.  (*Id.* at 4.)

22 Plaintiffs retained David M. Locala to provide expert testimony regarding the following:

23     a.  How a reasonable investor generally values an investment in a private technology
24         company, and the types of information a reasonable investor would consider important
        when deciding whether to sell their shares at a certain price[; and]

25     b.  Whether certain information known by ArcSoft at the time of the 2017 buyout would
26         have been important to a reasonable investor in considering whether to approve the
        proposed buyout and/or exercise dissenters' rights, and whether disclosure of that
27         information would have been consistent with industry customs and practices in the sale
        of a company. . . .

28 (Dkt. No. 212-3, at 5.)

United States District Court
Northern District of California

Defendants move to exclude Mr. Locala's expert testimony and report on the basis that Mr. Locala is not qualified to opine as to the information a "reasonable investor" would find pertinent. Defendants alternatively argue that, even if Mr. Locala is qualified, his opinions are unreliable and improperly invade the province of the jury.

Plaintiffs respond (1) that Mr. Locala's education and experience qualify him to provide expert testimony regarding what information a reasonable investor would find important, and that his testimony is in fact reliable; and (2) expert testimony on this topic is properly admissible.

## A.      Legal Standard on a Motion to Exclude.

Under Federal Rule of Evidence 702,

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.[2]   The party proffering an expert bears the burden to show the testimony is admissible.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 n. 10 (1993).  A district court's inquiry into admissibility "is a flexible one."  *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) (citation omitted).  In evaluating proffered expert testimony, the trial court is "a gatekeeper, not a fact finder."  *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (citation and quotation marks omitted).  "The district court's gatekeeping can be performed through numerous procedures – such as motion in limine briefing and oral argument, voir dire, and cross-examination at trial."  *United States v. Holguin*, 51 F.4th 841, 852 (9th Cir. 2022).

"[T]he trial court must assure that the expert testimony 'both rests on a reliable foundation

---

[2] An amended version of Rule 702 will take effect in December 2023.  *See Al Qari v. Am. Steamship Co.*, -- F. Supp. 3d --, 2023 WL 5628583, at *4 (E.D. Mich. Aug. 31, 2023) (discussing revisions).  The Court observed the amendments in resolving this motion.

United States District Court
Northern District of California

and is relevant to the task at hand.'" *Id.* at 564 (quoting *Daubert*, 509 U.S. at 597). "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. A trial court is not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 158 (1999) (quoting *General Elec. Co. v. Joiner*, 552 U.S. 136, 146 (1997)).

"Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564 (citation omitted). The judge is "supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car*, 738 F.3d at 969. Simply put, "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether [their] testimony has substance such that it would be helpful to a jury." *Id.* at 969-70.

**B.**   **Mr. Locala Is Qualified to Give Expert Testimony Regarding the "Reasonable Investor."**

Defendants argue that Mr. Locala is not well-suited to testify regarding the "reasonable investor" because Mr. Locala's testimony is entirely based on his experience advising sophisticated companies and working at large investment banks, and because Mr. Locala has never testified as an expert witness. Defendants suggest that Mr. Locala is likely an expert on mergers and acquisitions, including regarding investment banks' processes for valuing companies and issuing fairness opinions, but claim that his experience does not enable him to competently testify as to retail investors. Defendants' argument boils down to the idea that Mr. Locala is too qualified to provide an opinion regarding what reasonable investors look for or consider important in making investment decisions, because Mr. Locala's background is with top investment banks rather than "average, individual investors."

Plaintiffs respond that Mr. Locala is qualified because his Series 7 license and training equips him to discuss investments with all kinds of investors, even if he primarily advises large investment banks. Plaintiffs contend that the "totality" of Mr. Locala's thirty years of training and

experience qualifies him to opine as to information the "reasonable investor" would consider important.  Finally, Plaintiffs point to Mr. Locala's testimony that, based upon his experience, ordinary investors and investment banks would generally consider the same information to be important.

The Court agrees with Plaintiffs.  An expert may be qualified on the basis of training and experience alone, "which need only exceed 'the common knowledge of the average layman.'" *Holguin*, 51 F.4th at 854 (quoting *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002)). "This standard is liberal." *Id.*  Mr. Locala is qualified by his thirty-plus years of relevant experience working with and advising investors.  *Cf. Smilovits v. First Solar, Inc.*, No. CV12-00555-PHX-DGC, 2019 WL 6875492, at *3 (D. Ariz. Dec. 17, 2019) (holding years of experience as securities analyst qualified witness to testify regarding importance of allegedly concealed information to valuing stock).  Additionally, Mr. Locala has training and education relevant to advising "average, individual investors," through his schooling and Series 7 license.  The combination of Mr. Locala's training and experience qualifies Mr. Locala as an expert.

**C.**      **Mr. Locala's Testimony Regarding Reasonable Investors Is Reliable.**

Defendants argue that, even if Mr. Locala is qualified, the lack of tie between Mr. Locala's qualifications and his opinions on "reasonable investors" would nevertheless render his opinion unreliable.  Defendants urge the Court to follow the Ninth Circuit's opinion in *United States v. Sayre*, 434 Fed. Appx. 622, 624 (9th Cir. 2011), where the court affirmed exclusion of an expert who testified, "relying on [his] knowledge and experience," as to information the reasonable investor would find important.  Defendants argue that Mr. Locala's opinions are meaningless because "he admits that information he considers important could be considered unimportant by a reasonable investor." (Dkt. No. 212, at 19.)  Defendants also challenge Mr. Locala's opinion because, according to Defendants, he failed to consider the Plaintiffs' deposition testimony and inappropriately discounted deposition testimony from other former ArcSoft shareholders.

Plaintiffs counter that education and experience are sufficient to qualify an expert on materiality.  They cite *In re Twitter, Inc. Securities Litigation*, No. 16-cv-05314-JST, 2020 WL 9073168, at *3 (N.D. Cal. Apr. 20, 2020) for the proposition that, where testimony is based upon

United States District Court
Northern District of California

1   knowledge and experience, the individual expert's relevant knowledge and experience are more

2   important to the reliability inquiry than methodology or theory.

3          There is no "definitive checklist or test" for conducting the reliability inquiry.  *Daubert*,

4   509 U.S. at 593.  The Court has "broad latitude to determine" reasonable measures of reliability in

5   a particular case.  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153 (1999).  Expert opinion

6   "is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of

7   the relevant discipline."  *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir.

8   2014) (quoting *Daubert*, 509 U.S. at 597).

9          Plaintiffs have demonstrated that Mr. Locala's expertise outstrips that of the proffered

10  expert witness in *Sayre*.  In that case, the defendants argued that the witness's testimony was

11  reliable because it was based upon his "experience as a teacher and as someone working in this

12  field as to what it is that makes prices rise."  434 Fed. App'x. at 624.  *Sayre* does not indicate at

13  what level the witness taught, the witness's education or training, or the depth of the witness's

14  experience.  *See id.*  Here, Plaintiffs have shown that Mr. Locala has decades of relevant

15  experience, a relevant license, and relevant education.

16         The Court finds that *Twitter* is the more analogous case.  2020 WL 9073168.  In that case,

17  the plaintiffs moved to exclude an expert who testified as to what disclosures would have mattered

18  to investors and why.  *Id.* at *2.  Like Mr. Locala, the *Twitter* expert relied on his experience and

19  training rather than application of a particular methodology.  *Id.* at *3.  Defendants attempt to

20  distinguish *Twitter* because the expert in that case was "an adjunct professor of investment

21  portfolio management … with thirty years of experience related to securities valuation and

22  analysis," *id.* at *2, as opposed to Mr. Locala, who has thirty years of experience related to

23  mergers and acquisitions but who does not teach as an adjunct professor.  The Court is not

24  convinced that this is a meaningful difference, given the comparability between the two witness's

25  years of experience.

26         Mr. Locala's report relies on his three decades of experience assisting on both sides of

27  acquisitions and on his review of relevant documents produced in this case.  (Dkt. No. 212-3, at

28  6.)  To the extent that Defendants object to Mr. Locala's assumptions relating to credibility or his

United States District Court
Northern District of California

8

1    purported failure to consider relevant information, that bears upon the opinions' weight rather than

2    admissibility.  *See id.*  Mr. Locala's testimony is sufficiently reliable to clear the hurdle on

3    admissibility.

4    **D.      Mr. Locala's Expert Testimony Will Assist the Jury.**

5          Defendants argue that Mr. Locala's testimony will not aid the jury because it improperly

6    usurps the jury's role.  Defendants proffer a number of reasons for this conclusion, including that

7    the jury is capable of understanding whether information is material because the concept of a

8    "reasonable investor" is "within the jury's ordinary experience and understanding." *Sayre*, 434

9    Fed. App'x. at 623.  Allowing expert testimony on this issue, according to Defendants, would

10   overstep or mislead the jury.

11         The Court rejects Defendants' argument that any expert testimony relating to the

12   reasonable investor would mislead the jury or invade its role.  Defendants read the quoted

13   language from *Sayre* out of context.  In that case, the Ninth Circuit affirmed a district court's

14   decision to not provide a jury instruction defining "reasonable investor." *Id.*  The Ninth Circuit

15   did not comment on whether expert testimony is ever appropriate on the issue of how reasonable

16   investors consider information.  Mr. Locala's expert opinion and report could properly assist the

17   jury in determining how each piece of information withheld or disclosed by Defendants would

18   impact a reasonable investor's decision-making process.  *See Twitter*, 2020 WL 9073168, at *3

19   (permitting expert testimony regarding materiality and collecting cases).  Moreover, because the

20   jury is capable of understanding the concept of a reasonable investor, there is little risk of jury

21   confusion.

22         Defendants next argue that Mr. Locala expresses his opinions as legal conclusions because

23   he opines as to "materiality," and that his opinions should be excluded on that basis.  Use of

24   judicially defined terms by an expert witness generally constitutes an impermissible legal opinion.

25   *See In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 558 (C.D. Cal. 2014) (excluding opinion

26   testimony regarding the terms "false" and deceptive").  However, "a witness may properly be

27   called upon to aid the jury in understanding the facts in evidence even though reference to those

28   facts is couched in legal terms." *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998,

United States District Court
Northern District of California

9

1   1017 (9th Cir. 2004) (quoting *Specht v. Jensen*, 853 F.2d 805, 809 (10th Cir. 1988)).  The Court

2   agrees that use of the terms "material" and "materiality" could confuse the jury as to the

3   appropriate legal standard for an element of Plaintiffs' fraud, deceit, and concealment claim.

4   However, Plaintiffs have stated that they do not object to instructing Mr. Locala to avoid use of

5   the word "material" in his testimony.

6        Finally, as discussed above, whether or not Mr. Locala made inappropriate credibility

7   assessments or failed to consider relevant testimony is properly a subject of cross-examination and

8   is not a basis to exclude Mr. Locala's testimony.  *See Alaska Rent-A-Car, Inc.*, 738 F.3d at 970

9   (holding defendant's objections to expert's methodology "go to the weight of the testimony and its

10   credibility, not its admissibility.").

11        Defendants' Motion to Exclude is DENIED.

12        **CROSS-MOTIONS FOR SUMMARY JUDGMENT**

13        Plaintiffs move for partial summary judgment on the following issues: (1) whether

14   Defendants had a duty to disclose all material information in their control when Deng solicited

15   Plaintiffs' consent to the buyout; (2) whether Defendants breached that alleged duty; (3) whether

16   Deng owed Plaintiffs a fiduciary duty; (4) whether Deng breached his alleged fiduciary duties; (5)

17   whether Plaintiffs had a valid contract with ArcSoft regarding the IRA; and (6) whether ArcSoft

18   breached Section 2.1 of the IRA.

19        Defendants cross-move for summary judgment on two primary bases.  First, Defendants

20   assert that California Corporations Code Section 1312 bars Plaintiffs' post-buyout damages

21   claims.  Second, Defendants argue that Plaintiffs cannot demonstrate that Defendants caused

22   Plaintiffs' purported damages.

23   **A.    Legal Standard Applicable to Motions for Summary Judgment.**

24        Summary judgment is proper where the pleadings, discovery and affidavits show that there

25   is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a

26   matter of law." Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of

27   the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material

28   fact is genuine if there is sufficient evidence for a reasonable jury to find for the non-moving

*United States District Court*
*Northern District of California*

1    party.  *Id.* at 248-49.

2          The party moving for summary judgment bears the initial burden of identifying those

3    portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine

4    issue of material fact.  *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986).  When the moving

5    party has met its burden, the nonmoving party must go beyond the pleadings and, by its own

6    affidavits or discovery, set forth specific facts to show that there is a genuine issue for trial.  *Id.*

7    The nonmoving party must make a showing that there is more than "some metaphysical doubt as

8    to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587

9    (1986).  If the nonmoving party fails to produce enough evidence to show a genuine issue of

10   material fact, the moving party wins.  *Celotex*, 477 U.S. at 323.

11         At summary judgment, the court must view the evidence in the light most favorable to the

12   nonmoving party and make all reasonable inferences in favor of the nonmoving party.  *Tolan v.*

13   *Cotton*, 572 U.S. 650, 656-57 (2014).  If the evidence produced by the moving party conflicts with

14   the evidence produced by the nonmoving party, the court must assume the truth of the evidence set

15   forth by the nonmoving party with respect to that fact.  *Id.*

16   **B.      Plaintiffs Are Entitled to Partial Summary Judgment on Their Fraud Claim.**

17         Plaintiffs seek a ruling in their favor on two elements of their fraud claim: (1) that

18   Defendants had a duty to disclose, and (2) Defendants breached that duty because they withheld

19   material information.

20         In their cross-motion, Defendants argue that they are entitled to summary judgment on the

21   fraud claim because (1) Plaintiffs cannot establish actual or reasonable reliance on any

22   misrepresentations or omissions, and (2) Plaintiffs cannot prove that any affirmative

23   misrepresentations were made.

24         **1.      Deng Had a Duty to Disclose in Connection with Soliciting Shareholder
25                   Action.**

26         Under California law, a director owes a duty of "good faith" and loyalty to the corporation

27   and its shareholders.  Cal. Corps. Code § 309(a); *English & Sons, Inc. v. Straw Hat Restaurants,*

28   *Inc.*, 176 F. Supp. 3d 904, 927 (N.D. Cal. 2016) (interpreting statute).  A director's fiduciary

duties are not "limited to specific statutory duties and avoidance of fraudulent practices." *Jones v. H.F. Ahmanson & Co.*, 1 Cal.3d 93, 109, 460 P.2d 464, 472 (1969). "[D]irectors owe a duty to honestly disclose all material facts when they undertake to give out statements about the business to stockholders." *Hill v. State Farm Mut. Auto. Ins. Co.*, 166 Cal.App.4th 1438, 1490 (2008) (quoting *Kelly v. Bell*, 254 A.2d 62, 71 (Del. Ch. 1969)). The obligation extends to any disclosure issued "in contemplation of stockholder action." *St. Louis Police Ret. Sys. v. Severson*, No. 12-cv-5086-YGR, 2012 WL 5270125, at *4 (N.D. Cal. Oct. 23, 2012) (quoting *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del. 1994)); *see Dixon v. Cost Plus*, No. 12-cv-2721-LHK, 2012 WL 2499931, at *10 (N.D. Cal. Jun. 27, 2012) ("Directors are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action.").

Here, Plaintiffs argue that Deng owed a duty to disclose because he solicited their consent to the buyout. Plaintiffs point to the September 19, 2017 email signed by Deng which states, among other things, "I am writing to seek your approval with respect to the Merger, the Merger Agreement and the transactions contemplated thereby." (Dkt. No. 204-2.) Attached to the email is a letter on ArcSoft letterhead, signed by Deng, which includes the statement, "The purpose of this letter is to obtain from you your signed Written Consent (as defined below) attached here to as Appendix A to approve the Merger, the Merger Agreement, and the transactions contemplated thereby…" The letter also included Deng's phone number and said, "Should you have any questions concerning the above matters or anticipate any delays in responding, please do not hesitate to contact me." (*Id.*) Plaintiffs also point to the September 18, 2017 email sent from Deng's email address to Chan and which states: "Hi, Marc, below is the message the company will formally send to the three investors you are representing if the merger agreement and resolution is approved by the board tomorrow afternoon. Due to the time urgency, please review and seek the right person for reviewing and the signature in your entities asap. Best wishes[,] Michael." (Dkt. No. 204-20, Ex. 16.) Finally, Plaintiffs point to Defendants' admission that Deng contacted Chan in May 2017 to discuss a potential buyout. (Dkt. No. 162 ¶ 4.)

Defendants respond that there is a genuine issue of material fact regarding whether Deng

United States District Court
Northern District of California

1    solicited Plaintiffs' approval.  Defendants argue that the September 18, 2017 email is not a

2    solicitation because Deng testified that the purpose of the email was to give Chan time to review

3    the documents, rather than to solicit Chan's approval.  (Dkt. No. 210-11.)  Defendants also argue

4    that there is a dispute of fact regarding the origin of the email because Deng testified the

5    September 19, 2017 email was prepared and sent by other Board members following his recusal,

6    and because the email was sent from an administrative ArcSoft account rather than Deng's email

7    account.  (Dkt. No. 210-11.)  Defendants do not address the attached letter or its request to contact

8    Deng at his phone number with questions or concerns.

9           The Court agrees with Plaintiffs that no reasonable jury could find that Deng did not solicit

10   Plaintiffs' approval for the buyout.  The solicitation letter was signed by Deng and included his

11   contact information.  Moreover, Deng's deposition testimony was that he could not remember

12   whether or not he approved the email or letter to be sent with his signature—not that he in fact did

13   not approve the email.  (Dkt. No. 210-11, at 454:16-17.)  A witness's testimony that he "does not

14   remember" is insufficient to create a genuine dispute of fact.  *See Ruiz v. RSCR California, Inc.*, --

15   F. Supp. 3d --, 2023 WL 5088972, at *9 (C.D. Cal. Jul. 24, 2023) (finding testimony that witness

16   did not remember Plaintiff's statement was not sufficient to create dispute where Plaintiff

17   submitted declaration to the contrary); *Hernandez v. Roberts of Woodside*, 19-cv-07911-TSH,

18   2022 WL 19315, at *11 (N.D. Cal. Jan. 3, 2022) (testimony that employees did not remember

19   seeing plaintiff during his visit to store did not controvert plaintiff's testimony and documentary

20   evidence).

21          Accordingly, the Court finds that Deng owed a duty to disclose to Plaintiffs.

22          **2.      The Record Is Underdeveloped Regarding ArcSoft's Duty.**

23          Plaintiffs argue that Deng's duty can be imputed to ArcSoft.  Defendants respond that

24   Plaintiffs have failed to carry their burden because they offer no argument or evidence as to

25   ArcSoft's duty.  The entirety of Plaintiffs' argument relating to ArcSoft is as follows: "At the time

26   of the buyout, Deng was the CEO and a director of ArcSoft.  [citations]  Thus, Deng (and through

27   him, ArcSoft) had a duty to disclose all material information in his control when he asked

28   Plaintiffs to consent to the buyout."  (Dkt. No. 204, at 4.)  Plaintiffs did not provide authority or

United States District Court
Northern District of California

1   argument relating to ArcSoft's liability until their reply.  The Court ordered argument on the issue

2   of ArcSoft's duty.

3           At oral argument, Plaintiffs argued for the first time that *Persson v. Smart Inventions, Inc.*,

4   125 Cal. App. 4th 1141 (2005) should be dispositive.  In that case, the court affirmed the judgment

5   against the company for fraud committed by its officer under a theory of respondeat superior.  *Id.*

6   at 1168.  The court rejected the company's argument that the officer was acting for his own benefit

7   and not on behalf of the company, finding that fraudulent concealment required a continuing

8   wrongful act when the officer was acting in both his individual and officer capacity.  *Id.*  The court

9   reasoned as follows: the officer possessed the information at all times; the officer signed the stock

10   redemption agreement in his capacity as an officer; because his omission was ongoing, the officer

11   acted within the scope of his employment when taking action to sign the stock redemption

12   agreement without disclosing the omitted information; therefore, the company was liable as a

13   matter of law.

14           Defendants respond that Plaintiffs did not plead vicarious liability and have not shown that

15   Deng's conduct was within the scope of Deng's employment.  They urge that summary judgment

16   on a vicarious liability theory that was not pleaded or briefed is inappropriate.  Defendants cite *In*

17   *re Tesla, Inc. Securities Litigation*, 477 F. Supp. 3d 903 (N.D. Cal. 2020) for the proposition that

18   Plaintiffs needed to plead and show that Deng's alleged fraud was within the scope of his

19   employment, and that Plaintiffs failed to do so.  *See id.* at 926 ("It is beyond dispute that a

20   corporation can be liable for the fraud committed by its officers, so long as the officer commits it

21   within the scope of his or her employment.").[3]  Defendants also assert that Deng, if he committed

22   fraud, acted against the interests of ArcSoft, and that ArcSoft cannot be liable for conspiracy

23   against itself.  *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP*, 133 Cal.

24   App. 4th 658, 679 (2005) ("Nor is a corporation chargeable with knowledge of an officer who

25

26   [3] Defendants provided the Court with *RevPlus, Inc. v. Donde*, No. SACV 11-1583 AG, 2012 WL
     13024083 (C.D. Cal. Sept. 14, 2012) in response to the Court's Notice of Questions (Dkt. No.
27   222.)  *RevPlus* does not apply here.  The court in that case held that plaintiffs cannot directly sue a
     corporation for breach of fiduciary duty because corporations do not owe fiduciary duties.  2012
28   WL 13024083 at *4.  The court observed that tort claims would be permissible.  *Id.*  Plaintiffs here
     allege fraud, a tort claim.

United States District Court
Northern District of California

1  collaborates with outsiders to defraud the corporation.").

2        Defendants are incorrect that Plaintiffs failed to plead or argue vicarious liability, (*see* Dkt.

3  No. 188 ¶ 35), but correct that Plaintiffs allege direct liability as to their fraud claim in particular,

4  (*id.* ¶ 349 ["The Company and Mr. Deng made false and misleading statements…"]).  Plaintiffs

5  have not established ArcSoft's direct liability or that Deng was acting within the scope of his

6  employment.

7        Plaintiffs have not met their burden to show that there is no question of fact such that

8  Deng's conduct can be imputed to ArcSoft as a matter of law.  Accordingly, the Court denies

9  Plaintiffs' motion as to ArcSoft's duty.

10       **3.      Defendants Withheld Material Information.**

11       As discussed above, Deng had a duty to honestly disclose all "material" facts in soliciting

12  Plaintiffs' approval for the buyout.  The parties agree that a fact is material "if there is a

13  substantial likelihood that, under all the circumstances, a reasonable investor would consider it

14  important in reaching an investment decision."  *Persson*, 125 Cal. App. at 1163.  "Ordinarily, the

15  issue of materiality is a mixed question of law and fact involving the application of a legal

16  standard to a particular set of facts."  *Sitrick v. Citigroup Global Markets, Inc.*, No. CV 05-3731

17  AHM, 2009 WL 1298148, at *5 (C.D. Cal. Apr. 30, 2009).  "However, if reasonable minds cannot

18  differ on the issue of materiality, the issue may be resolved as a matter of law."  *Ins. Underwriters*

19  *Clearing House v. Natomas Co.*, 184 Cal. App. 3d 1520, 1527 (1986).

20       Plaintiffs argue that Defendants wrongfully withheld the following: (a) GAAP financials

21  for the first two quarters of 2017; (b) a more detailed 2016 financial statements; (c) a 2016

22  financial statement audited by a Chinese firm; (d) Deng's most recent financial projections for

23  ArcSoft; (e) recent "customer wins"; (f) Deng's agreement with an investment bank to sell a large

24  equity stake of the post-buyout company at a greater price per share than he offered to pay

25  Plaintiffs; and (g) Deng's plans to pursue an IPO of the post-buyout company in China.  The Court

26  will address each of these pieces of information in turn.

27       **a.   GAAP Financials for the First Two Quarters of 2017.**

28       Plaintiffs first argue that Defendants should have disclosed GAAP financial statements for

United States District Court
Northern District of California

the first two quarters of 2017, which were available to Defendants months prior to the buyout. Plaintiffs argue the statements were material because they showed that ArcSoft's income for the first two quarters of 2017 exceeded its income for the entirety of 2016 by almost 100 percent. Plaintiffs contend that "[r]easonable minds cannot differ that a spike in operating profits would be important to a reasonable investor."  (Dkt. No. 204, at 7-8) (citing *SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir. 1980) ("Surely the materiality of information relating to financial condition, solvency and profitability is not subject to serious challenge.") and *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 n. 9 (3d Cir. 1997) ("Information concerning the firm's current and past earnings is likely to be highly 'material.'")).  Plaintiffs cite Locala's expert report and testimony for the proposition that the 2017 quarterly financials showed "ArcSoft was at a positive inflection point."  Plaintiffs also cite to the testimony of Defendants' expert Frederick G. Van Zijl for the proposition that quarterly statements are "essential," and that they show ArcSoft had "positive forward momentum" and "was not in distress at the time of the buyout."

Defendants respond with a circular argument that the quarterly financials are not material because they were not required to produce them.  Defendants point to testimony that ArcSoft's "general practice" was to share only annual financials, because quarterly financials may be misleading.  Defendants cite the expert testimony of Reza Dibadj for the proposition that small private companies are not held to the same standards of disclosure as large public companies. (Dkt. No. 210-46, ¶ 93.)  Defendants do not explain how a difference in practice or standard would impact materiality of the omitted financials.

Defendants also assert that Plaintiffs "cherry-picked" Van Zijl's statements that the quarterly financials show ArcSoft "was not in distress at the time of the buyout," because Van Zijl also testified that the company had "just fired a massive number of people and they needed engineers to grow new product."  (Dkt. No. 210, at 32 n. 17.)

The Court finds that no reasonable jury could find that the 2017 quarterly financials were immaterial.  Although Defendants produced testimony that quarterly financials could misleadingly show seasonal swings, Defendants do not refute that the quarterly financials were material.  Both Locala and Van Zijl testified that the quarterly financials would be important for an investor to

16

consider prior to consenting to a buyout.  (Dkt. No. 204-21, at 11 (Locala stating, "In my opinion, such recent financial information would have been of particular interest to shareholders at the time of the transaction given the visible and positive trends highlighted in these results."); Dkt. No. 204-24, at 10 (Van Zijl testifying that the first two quarterly statements for 2017 are "first foundational, right, got to have them.  No doubt."))  It is fundamental that the financial performance of a company is material to an investor deciding to sell or hold its shares.

### b.  February 2017 Set of More Detailed 2016 Financials.

Plaintiffs argue that Defendants withheld a financial statement from February 2017 with more detail than had been produced along with the Information Statement in soliciting consent to the buyout.  Plaintiffs argue that a more detailed balance sheet reflected that the "main business" of ArcSoft had $11,944,000 of income from operations in 2016 rather than the $6,140,000 in income stated in the Information Statement.  Plaintiffs contend the more detailed balance sheet included information that two discontinued business lines were subtracted from the main business's income to show the company's overall income.

Plaintiffs also argue that the more detailed financial statement revealed the "total liabilities" reported in the Information Statement were misleading, because $59,583,000 of the $70,866,000 in liabilities were "deferred revenues."  Plaintiffs argue that deferred revenues are not liabilities and are seen as positive by reasonable investors.  In support, they cite Mr. Locala's expert report and testimony that deferred revenue is important because it indicates projected future revenues and, in ArcSoft's case, reflected a "more positive" financial picture.  (Dkt. No. 204-21, Ex. 17 ¶ 65.)

In response, Defendants provide testimony from an ArcSoft board member that deferred revenues would not be material "to whether to merge a company or not" in his opinion.[4]  (Dkt. No. 210-12, at 151:4-8.)  Defendants do not address the income breakdown raised by Plaintiffs relating to the "main business" or ancillary business lines.

The Court finds that Plaintiffs have not met their burden of production regarding the

---

[4] Though not referenced by the parties, the Court notes in the next sentence, the witness testified that deferred revenue "is important to an investor."  (Dkt. No. 210-12, at 151:13.)

United States District Court
Northern District of California

materiality of the more detailed financials.  Viewing the evidence in the light most favorable to Defendants, as the Court is required to do, the Court finds that a reasonable jury could find that more detailed financial information relating to the revenue from different business lines and deferred revenues were not material.  Plaintiffs do not provide evidence that they were unaware of ArcSoft's discontinued business lines or that they understood (or a reasonable investor would understand) the Information Statement to exclude losses from the discontinued business lines. Plaintiffs likewise do not provide evidence regarding whether a reasonable investor would be unaware that deferred revenues would be presented as liabilities, and Mr. Locala's expert report concedes that US GAAP "require[s] deferred revenue to be booked as a liability at the full contracted revenue amount."  (Dkt. No. 204-21, Ex. 17 ¶ 62.)  The materiality of the more detailed financials remains a question of fact for the jury.

### c.  Audited 2016 Financials.

Plaintiffs argue that a second set of financials from February 2017 was also wrongfully withheld.  That set was audited by BDO, a firm headquartered in the United States, under Chinese accounting standards rather than US GAAP.  The audited financials showed that ArcSoft had a positive book value of $34.1 million at the end of 2016, compared to the negative $29 million book value provided in the Information Statement.  (Dkt. No. 204-2, Ex. 1, at ARCSOFT0036011.)  ArcSoft's former financial controller Yan Jin stated in an email to potential investors that the Chinese financials "reflect current business and provide true and fair [sic] to all the report users,"  (Dkt. No. 204-10, Ex. 8, at ARCSOFT005817), and Deng provided the audited financials to his new investors before the buyout, (Dkt. No. 204-43, Ex. 35, at 52:03-13.)  Mr. Locala opined that the audited financials would be important to a reasonable investor because ArcSoft did not have audited financials under U.S. GAAP standards. (Dkt. No. 204-21, Ex. 17, ¶ 34.)

Defendants in turn point to Yan Jin's statement that there are "a lot of difference[s]" between U.S. and Chinese accounting standards.  (Dkt. No. 210-15, Ex. M, at 23:2.)  They also provide testimony from former ArcSoft board member Daniel MacKeigan that he did not believe he would need the Chinese audit because he considers Chinese accounting standards to be

United States District Court
Northern District of California

1  unreliable.  (Dkt. No. 210-12, Ex. J, 62:7-14; 67:18-68:5.)  Ranjeet Alexis testified on behalf of

2  former ArcSoft shareholder Intel Capital that the Chinese audit would not have been important to

3  Intel, because it would be "getting another flavor of the same financials [Deng] is providing" and

4  he "[has] no idea what [Chinese] accounting principles are."  (Dkt. No. 210-16, Ex. N, 92:18-

5  93:22.)

6        The Court finds that Defendants have shown a genuine issue of fact regarding the

7  materiality of the audited 2016 financials.  A jury could reasonably find that the financials would

8  not be important to a reasonable investor, given their difference from US GAAP standards and an

9  actual investor's disavowal of the importance of the financials.

10        **d.  Deng's Financial Projections.**

11        Plaintiffs next claim that the September 16, 2017 financial forecast was material as a

12  matter of law.  The forecast projected growth of 24 percent or more for each of the next five years,

13  and a tripling of net profits.  (Dkt. No. 204-11, Ex. 9.)  Plaintiffs argue that the projections were

14  consistent with an agreement signed by Deng with Huatai days later.  Defendants respond that

15  "projections are just projections," that Deng testified that he did not agree with the numbers, and

16  that ArcSoft's then-controller did not do any due diligence in preparing the forecast.  Defendants

17  also argue that the projections departed from ArcSoft's normal practice and thus are not entitled to

18  a presumption of reliability.

19        The evidence produced by both parties is deficient.  Plaintiffs' exhibit purporting to be an

20  agreement between Deng and Huatai and corroborating the reliability of the forecast is unreadable.

21  (Dkt. No. 204-25, Ex. 21.)  Defendants' exhibit purporting to be testimony that ArcSoft did not

22  "prepare" forecasts in the ordinary course of business does not, in fact, say so—only that ArcSoft

23  did not regularly "provide" forecasts to investors.  (Dkt. No. 210-15, Ex. M, 68:7-8.)  Deng's

24  deposition testimony regarding the source and purpose of the projections is internally inconsistent.

25  (*Compare* Dkt. No. 210-11, Ex. I, 353:18-354:1 [numbers were for Deng's own understanding],

26  *with id.* at 357:7-10 [projections were aggressive in order to negotiate higher price for company].)

27        Internal projections are generally material to a reasonable investor.  *U.S. v. Smith*, 155 F.3d

28  1051, 1064 n. 20 (9th Cir. 1998) ("After all, investors are concerned, perhaps above all else, with

19

the future cash flows of the companies in which they invest.  Surely, the average investor's interest would be piqued by a company's internal projections of economic downturn.")  Financial projections forecasting a large jump in revenue would surely be material to an investor.

The problem for Plaintiffs is that Defendants dispute that the forecasts were forecasts at all. Deng testified that he asked Yan Jin to make the projections by plugging in the percentage growth Huatai wanted to see in the event they invested so that Deng could "have some data in mind" for what that growth would look like.  (Dkt. No. 210-11, Ex. I, 355:21-356:17.)  In other words, the forecast may have been a hypothetical rather than a prediction of growth.

Plaintiffs argue that Deng's testimony is "uncorroborated and self-serving," and thus should be disregarded by the Court.  *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002).  However, a "district court may not disregard a piece of evidence at the summary judgment stage solely based on its self-serving nature."  *Nigro v. Sears, Roebuck and Co.*, 784 F.3d 495, 497 (9th Cir. 2015).  Deng's testimony regarding the source and purpose of the projections is based upon his personal knowledge and legally relevant, although it is not internally consistent.  *See id.* (holding district court may not disregard testimony that is "based on personal knowledge, legally relevant, and internally consistent").  Moreover, considering the evidence in the light most favorable to Defendants, Deng's account is corroborated by Yan Jin's.  (Dkt. No. 210-15, at 96:22-24.)

It may well be that the growth rate demanded by or pitched to undisclosed potential investors is material to a reasonable investor.  But that is not what Plaintiffs have argued, and they instead urge the Court to make an inference that the projections were genuine.  Defendants have created a genuine issue of material fact as to whether the projections at issue reflected ArcSoft or Deng's actual financial forecast.  The materiality of the projections remains a question for the jury.

### e.   ArcSoft's New "Customer Wins."

Plaintiffs contend that Defendants withheld material information that ArcSoft had obtained contracts with "most of the 1st tier mobile phone makers on dual cam solutions" prior to the buyout.  ArcSoft had won more than three times the number of customer contracts for its dual camera business line in the first half of 2017 than it had in the entirety of 2016.  Deng wrote that

United States District Court
Northern District of California

1    he believed ArcSoft could reach $46 million in billings for 2017.  (Dkt. No. 204-31, Ex. 25, at

2    ARCSOFT0053233.)  Plaintiffs again cite *Persson*, where a California court affirmed a jury

3    decision that an undisclosed new product was material.  125 Cal. App. 4th at 1163.

4         Defendants dispute that the total number of contracts is an indicator of ArcSoft's business

5    prospects.  They also point to decreasing business for other products sold by ArcSoft and a

6    decrease in total billings in the first half of 2017.  Defendants further argue that "billings" do not

7    equate to "recognized revenue" and are thus not material.  (*See* Dkt. No. 210-47, Ex. SS, at 36:11-

8    25 (Van Zijl testifying that the numbers did not indicate growth in revenue "because of the

9    relationship between contract signings, billings, deferred revenue and revenue recognition").)

10   Finally, Defendants argue that *Persson* requires a jury, not the Court, to determine the materiality

11   of the "customer wins."

12        The Court finds that a genuine dispute of fact exists regarding the materiality of the new

13   customer contracts.  Plaintiffs have not provided enough information regarding the growth of

14   contracts in the first half of 2017 as compared to previous years or an explanation of how a shift to

15   a royalty-based billing model would impact revenues.  A reasonable jury could agree with

16   Defendants that, without more information, growth in billings and revenue do not necessarily

17   align.

18        **f.  Deng's Agreement with Huatai.**

19        Plaintiffs argue that Deng was required to disclose his plans to sell a stake in ArcSoft to

20   Huatai immediately following consummation of the buyout.  Plaintiffs argue that they were shut

21   out of a more attractive competing offer for purchase.  For purposes of the buyout, ArcSoft was

22   valued at $150.2 million.  (Dkt. No. 204-32, Ex. 26, at ARCSOFT0054688.)  For purposes of the

23   deal with Huatai, ArcSoft was valued at $250.8 million.  (Dkt. No. 204-14, Ex. 11, at

24   ARCSOFT0054549.)  However, it is unclear from Plaintiffs' evidence if ArcSoft's jump in value

25   occurred as a result of a cash infusion from the investors, or if Huatai purchased its shares based

26   on a heightened value.

27        Defendants' only rebuttal is that Huatai's investment was contingent on Deng buying out

28   ArcSoft's shareholders rather than a competing offer.  Defendants offer no explanation for the

United States District Court
Northern District of California

21

1    $100 million jump in ArcSoft's value upon Deng's purchase of the shares.

2        Defendants' argument strains credulity.  If in fact Defendants represented ArcSoft's value

3 to Plaintiffs as significantly lower than the value they simultaneously negotiated with Huatai, then

4 that discrepancy would be material.  The value of a company is surely important to an investor in

5 reaching an investment decision.  Because it is unclear whether Defendants represented ArcSoft to

6 be more valuable to Huatai, the materiality of Deng's agreement with Huatai remains a question

7 for the jury.

8       **g.  The Plan to Take ArcSoft Public in China.**

9        As part of the agreement with Huatai, Defendants prepared to take ArcSoft public in

10 China.  The contract stated "ArcSoft (Hangzhou) Multimedia Technology Company Limited . . .

11 will be the to-be-listed entity in preparation for the ArcSoft Group going public."  (Dkt. No. 204-

12 14, Ex. 11, at ARCSOFT0054545.)  ArcSoft IPO'd in July 2019.  Plaintiffs argue that these plans,

13 like the sale to Huatai, were material because they represented a "more-than hypothetical

14 alternative opportunity" to receive liquidity for their shares.  (Dkt. No. 204-21, Ex. 17, ¶ 75.)

15        Defendants respond that a reasonable jury could find the IPO plans were "not sufficiently

16 concrete to be material" because ArcSoft did not meet the listing requirements for any Chinese

17 stock exchange at the time of the buyout.[5]  Defendants do not actually assert that the IPO plans

18 were not in an advanced stage.[6]

19        The Court finds that the materiality of the IPO plans remains an issue for the jury.  In the

20 case cited by Plaintiffs, *Altimeo Asset Management v. Qihoo 360 Technology Co. Ltd.*, 19 F.4th

21 145 (2d Cir. 2021), the court found a "plausible inference" that the defendants had made IPO plans

22 at the time they issued "Proxy Materials" denying plans to relist.  *Id.* at 150-51.  Here, the Court

23 may not make a similar inference on summary judgment: As the nonmoving parties, Defendants

24

25   [5] Defendants cite the testimony of Intel's board observer, who stated, "It's hard to tell [if knowledge of an IPO would be material] – it's hard to tell because, as I said – you said initial
26 public offering.  They're taking steps.  If it was a first step in a hundred-step process, you know, it's – it's an idea.  It's immaterial.  If it's a 99th step in a hundred-step process, yeah, maybe we'd
27 like to know what's going on there."  (Dkt. No. 210-16, Ex. N, 127:9-16.)
  [6] Although not marshaled in opposition to the question of materiality, Defendants note in their
28 opposition that the Shanghai STAR Market on which ArcSoft went public was not opened until November 2018, more than a year after the buyout.  (Dkt. No. 210-44, Ex. PP, ¶ 60.)

United States District Court
Northern District of California

United States District Court
Northern District of California

are entitled to an inference that a singular reference to a listing entity in the recitals of a contract does not represent any developed plans to list the company. Although Defendants did not produce rebuttal evidence, Plaintiffs have not demonstrated in the first instance that the IPO plans were sufficiently developed at the time of the buyout to be material as a matter of law.

### 4.    Plaintiffs Have Established a Genuine Issue of Material Fact Regarding Affirmative Misrepresentations.

Defendants claim that they are entitled to summary judgment on Plaintiffs' affirmative misrepresentation fraud theory to the extent it is predicated on Chan's conversations with Deng. Defendants argue that Plaintiffs have minimal evidence that the conversations occurred, and no evidence that Deng made any misrepresentations during those conversations regarding the health of ArcSoft or its buyout prospects. Deng denies warning Chan (or anyone) about ArcSoft's financial health or prospects in 2016 or 2017.

Plaintiffs respond that Chan's testimony alone is sufficient to raise a genuine issue of material fact. Plaintiffs argue that, although Chan did not remember specific dates and exact wording from phone calls with Deng, Chan nevertheless remembered the substance of those calls.

The Court does not weigh conflicting deposition testimony at the summary judgment stage. *Zetwick v. Cnty. of Yolo*, 830 F.3d 436, 441 (9th Cir. 2017). Plaintiffs are free to test Chan's memory at trial, but that goes to the weight of the evidence. Whether Chan or Deng is more credible is for the jury to decide.

### 5.    Plaintiffs Have Established a Genuine Issue of Material Fact Regarding Reliance.

Reliance is an element of fraudulent misrepresentation and omission claims. *Mirkin v. Wasserman*, 5 Cal.4th 1082, 1093 (1993). Reliance must be both "actual" and "reasonable." *West v. JPMorgan Chase Bank, N.A.*, 214 Cal. App. 4th 780, 794 (2013).

#### a.    "Actual" Reliance.

The parties agree that Defendants did not directly communicate with Plaintiffs, and so Plaintiffs could not have directly relied upon Defendants' representations regarding ArcSoft's financial performance. The parties disagree, however, on whether Plaintiffs can establish reliance

23

through Defendants' misrepresentations or omissions to Chan.  Defendants urge the Court to make a finding that Plaintiffs cannot establish actual reliance through either an "indirect" or "agency" theory.

Under California law, a defendant is liable under an indirect misrepresentation theory where "the defendant made a representation to a third party, the defendant intended or had reason to expect that the substance of the communication would be repeated to the plaintiff and would induce the plaintiff's reliance, and the plaintiff was misled when the substance of the communication was repeated to the plaintiff." *Bullock v. Philip Morris USA, Inc.*, 159 Cal. App. 4th 655, 676 (2008).  "The indirect communications fraud theory requires a chain of fraudulent representations which are repeated by one victim to another." *Gawara v. U.S. Brass Corp.*, 63 Cal. App. 4th 1341, 1357 (1998).  Plaintiffs must "show the misrepresentations (or omissions) were communicated by the intermediary to the plaintiff," but it is an open question whether a "rating, certification, certification, [or] recommendation" by the agent to the plaintiff would satisfy this requirement. *Id.* at 1357-58 (discussing *Mirkin v. Wasserman*, 5 Cal.4th 1082 (1993)).  A plaintiff need not prove reliance on a specific misrepresentation, so long as she relied on the substance of the misrepresentation. *Id.* at 677.  *See also The MEGA Life & Health Ins. Co. v. Super. Ct.*, 172 Cal. App. 4th 1522, 1530 (2009) (recognizing "that it is not always necessary that a fraudulent misrepresentation be made to the intended actor.").  For omission claims, where obviously there is no substance to communicate, "[o]ne need only prove that, had the omitted information been disclosed, one would have been aware of it and behaved differently." *Mirkin*, 5 Cal.4th at 1093.

Under an agency theory of reliance, a defendant is liable where he made a representation to the plaintiff's agent, and that agent acted in reliance on the representation. *See Thrifty-Tel, Inc. v. Bezenek*, 46 Cal. App. 4th 1559, 1568 (1996) ("[T]he notion that reliance by an agent may be imputed to the principal, even though the misrepresentation was never communicated to the principal, is ensconced in California law."); *Lovejoy v. AT&T Corp.*, 92 Cal. App. 4th 85, 95 (2001) ("Under the principle of indirect reliance, a fraudulent misrepresentation is actionable if it was communicated to an *agent* of the plaintiff and was acted upon by the agent to the plaintiff's

24

damage.").  The quintessential agency misrepresentation case is that between a patient and a drug manufacturer for injury caused by drugs that were prescribed by the plaintiff's physician, on the basis that the manufacturer made misrepresentations to the physician and the physician acted as the plaintiff's agent.  *Lovejoy*, 92 Cal. App. at 95.

Defendants argue that the indirect misrepresentation theory cannot apply because Plaintiffs admit they never communicated with Chan regarding the substance of Chan's communications with Deng and ArcSoft.  Plaintiffs concede this point.  (Dkt. No. 214, at 26 ("[I]t is irrelevant that [Chan's] family members did not read the Information Statement, were not told about [Chan's] conversations with Mr. Deng, and knew very little about ArcSoft.").)  Without repetition of the substance of the alleged misrepresentations to Plaintiffs, Plaintiffs cannot have indirectly relied upon the misrepresentations.

Plaintiffs argue that they can instead establish reliance through the agency theory because Chan acted as Plaintiffs' agent with respect to their shares in ArcSoft.  Plaintiffs describe the following as "the way Plaintiffs held their shares," which according to Plaintiffs establishes that reliance by Chan alone is sufficient:  Plaintiff Lei Li executed a "Declaration of Trust" stating that she held her shares of ArcSoft "in trust" for Chan, and that she would "at all times deal with" the shares "in accordance with the instructions from time to time given to [them] by [Chan] and not otherwise."  (Dkt. No. 214-14, at 2.)  Li signed the consent to the buyout at Chan's direction, without discussion.  (Dkt. No. 214-13, at 14.)  Similarly, the sole director and owner of Plaintiff Strong Wealth, Li Ngai, signed a "Declaration of Trust" purporting to hold the shares of Strong Wealth in trust for Chan and to take action only at Chan's direction.  (Dkt. No. 214-17, at 2.)  Plaintiff Pacific Smile had two directors, one of whom signed a substantially identical "Declaration of Trust" on behalf of Chan.  (Dkt. No. 214-18, at 1.)  Plaintiffs assert that the other director, Chan's mother-in-law, "acted as though" she had signed such a document, and that she signed the buyout consent when Chan's secretary asked her to.  (Dkt. No. 210-7, at 4.)  In short, Plaintiffs argue that because they all entrusted care of the shares to Chan, Chan's reliance alone is relevant.

In reply, Defendants urge that *Hasso v. Hapke*, 227 Cal. App. 4th 107 (2014) is directly on

United States District Court
Northern District of California

point.  In that case, a plaintiff trustee sued several entities and their conflicted officers after two

trusts lost sizable investments in one of the entities.  *Id.* at 112-13.  The plaintiff trustee alleged

that the defendants misled the trusts in order to fraudulently induce the investments.  *Id.*  However,

the officers did not make any misrepresentations directly to the trustee, but instead to a third

party—a parent of the minor children trust beneficiaries—who in turn convinced the trustee to

invest.  *Id.* at 128.  The court found that the agency theory of liability for fraudulent

misrepresentations did not apply, because the trustee, not the third party, "was responsible for

evaluating the information . . . [and] took action by executing the necessary documents and

transmitting the funds."  *Id.* at 130.  The court then applied the indirect theory of liability for

fraudulent misrepresentations, finding there was sufficient evidence for the jury to find that the

third-party conveyed the misrepresentations to the trustee.  *Id.* at 130-131.

       *Hasso* is distinguishable.  The ultimate actor, the trustee, was "a competent, highly

successful businessman who discussed the investment with [the defendant] and reviewed the

written documentation."  *Id.* at 129.  In contrast, Defendants produce no evidence demonstrating

that Plaintiffs were sophisticated actors who directly discussed the investment with Defendants

and reviewed the written documents.

       Plaintiffs are much more akin to the plaintiff in *Roberts v. Salot*, 166 Cal. App. 2d 294

(1958), a case distinguished by the *Hasso* court.  *See Hasso*, 227 Cal. App. 4th at 129.  In *Roberts*,

a "shyster" duped a daughter to enter a transaction with the understanding it would forestall a

foreclosure on her father's home.  166 Cal. App. 2d at 297.  Based on the shyster's

misrepresentations, the daughter "took the documents to her father, had him sign them and had the

[documents] notarized."  *Id.*  The father had authority and was the ultimate actor, but he was

elderly, infirm, and unfamiliar with legalese.  *Id.*  The court rejected the shyster's argument that he

could not be liable because he did not directly deal with the plaintiff, finding that the daughter was

the father's agent.  *Id.* at 300.

       Here, Defendants agree that Plaintiffs do not read written English, did not have any

ArcSoft documents translated for them, did not speak with any ArcSoft officers or directors, did

not understand what a director is supposed to do, and, for one of the Plaintiffs, that she was "too

United States District Court
Northern District of California

old" to have any involvement.  (Dkt. No. 210 at 3.)  Plaintiffs were entirely dependent upon Chan to instruct them as to the investments.  (*See id.*)  Thus, as in *Roberts*, a jury could find that Defendants made misrepresentations to Chan with the intention that Chan would direct Plaintiffs to act in accordance with those misrepresentations.

### b.    "Reasonable" Reliance.

The jury determines the reasonableness of a plaintiff's reliance as a question of fact "[e]xcept in the rare case where the undisputed facts leave no room for a reasonable difference of opinion."  *West*, 214 Cal. App. 4th at 794.  The instant case is not the "rare case."

Defendants urge the Court to find that Chan was a sophisticated investor who unreasonably relied upon Deng's statements despite noticing "red flags" that Deng was "not forthcoming" with information.  Defendants also point to Chan's testimony that he found the Information Statement issued in connection with the buyout to be deficient.

Plaintiffs counter that Chan had known and trusted Deng "for many years" and that he believed Deng had the best information as CEO of ArcSoft.  Plaintiffs further argue that they were unaware of the existence of the omitted information, and so could not have known to make inquiries.

A reasonable jury could find that Chan reasonably relied on Deng and the Information Statement in evaluating the buyout.  Reasonable reliance remains an issue for trial.

### C.    Plaintiffs Are Entitled to Partial Summary Judgment as to the Existence of Deng's Fiduciary Duty, but Not as to Breach.

This Court has previously determined that officers and directors owe a fiduciary duty to stockholders.  (Dkt. No. 112, at 24) (citing *Singhania v. Uttarwar*, 136 Cal. App. 4th 416, 426 (2006) and *Southern Pac. Co. v. Bogert*, 250 U.S. 483, 488 (1919)).  Thus, the issues before the Court are (1) whether the fiduciary duties owed by Deng as an officer include a duty to disclose in connection with soliciting shareholder action, and (2) whether the failure to obtain a fairness opinion was a *per se* breach of that duty.[7]

---

[7] Plaintiffs do not move on the basis of the Inherent Fairness Doctrine or oral misrepresentations.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

Plaintiffs ask the Court to follow the reasoning of the Delaware Court of Chancery in *In re Columbia Pipeline Group, Merger Litigation*, 299 A.3d 393 (2023). In that case, the court held that officers had a duty to disclose all material information in their control in connection with seeking shareholder action. *Id.* at 483. It noted that "the duty was particularly stark" as to the CEO, because he signed the proxy statement. *Id.*

Defendants respond that Plaintiffs erroneously conflate Delaware and California law. Defendants urge that California law differs in that officer duties are not coextensive with director duties as they are in Delaware.[8] If the duties are not coextensive, according to Defendants, then Plaintiffs have failed to define Deng's duties and Plaintiffs' motion must fail.

Whether or not officer and director duties are coextensive in California, officers and directors alike owe a duty of good faith to shareholders "in the exercise of powers that are theirs by virtue of their position." *Singhania*, 136 Cal. App. 4th at 426. The Court may properly look to consistent Delaware law as a guide. *Bader v. Anderson*, 179 Cal. App. 4th 775, 791 n. 5 (2009).

For the reasons explained above, the Court finds that Deng exercised his powers as an officer of ArcSoft to solicit Plaintiffs' consent to the buyout. Therefore, Deng owed a fiduciary duty to disclose material information within his control. Like the CEO in *Columbia Pipeline* who signed the proxy statement, Deng signed the Information Statement soliciting Plaintiffs' consent. *See* 299 A.3d at 483. His duty was thus "particularly stark." *See id.*

Less clear is whether Deng breached his fiduciary duty by failing to provide a fairness opinion under California Corporations Code Section 1203. The statute is written in the passive voice: "the opinion shall be delivered to the shareholders at the time that the tender offer is first made in writing to the shareholders." Cal. Corps. Code § 1203(a)(2). Plaintiffs offer the bill analysis from the Senate Insurance, Claims and Corporations Committee to support a reading that

---

[8] Defendants write in their brief that California law differs from Delaware law in that officer duties are not defined by statute in California as they are in Delaware. (Dkt. No. 210 at 29.) Defendants do not cite a supporting Delaware statute, and the Court is unaware of one. Rather, the Supreme Court of Delaware has outlined the scope of officer duties. *See Gantler v. Stephens*, 965 A.2d 695, 709 (Del. 2009) ("In the past, we have implied that officers . . ., like directors, owe fiduciary duties of care and loyalty, and that the fiduciary duties of officers are the same as those of directors. We now explicitly so hold.").

1   Deng was responsible for compliance with the statute.  (Dkt. No. 204-48.)  Plaintiffs further argue

2   that it is logical that the officer who communicates with shareholders regarding the buyout also

3   conveys the fairness opinion.

4          Defendants in turn offer testimony from one of Plaintiffs' experts that it would be "self-

5   defeating" for a conflicted officer to obtain the fairness opinion.  (Dkt. No. 210-51 at 233:10-16.)

6   "The generally accepted practice" is instead to form a special committee to evaluate the proposed

7   deal and hire an advisor for a fairness opinion.  (*Id.* at 233:20-25.)  Failing that, the expectation is

8   for the board to engage the opinion.  (*Id.* at 234:1-6.)

9          The Court finds that the question of whether Deng breached his duty by failing to provide

10  a fairness opinion is a fact question for the jury.  Certainly, ArcSoft was legally obligated to

11  provide a fairness opinion in connection with the sale, but the statute does not compel particular

12  officers to do so.  As Plaintiffs' expert testified, the better practice is for a disinterested special

13  committee to provide the opinion, not the conflicted officer.  As Deng communicated regarding

14  the buyout to shareholders, a reasonable jury could find that Deng was also personally responsible

15  for conveying a fairness opinion.  But that is an inference in favor of the moving party where a

16  reasonable inference in favor of the nonmoving party exists:  it could be that Deng did not provide

17  the fairness opinion because ArcSoft, not Deng, was responsible for providing it.  ArcSoft's

18  failure to provide a fairness opinion was not a *per se* breach by Deng.

19  **D.    Defendants Have Not Met Their Burden to Show That California Corporations Code Section 1312 Bars Plaintiffs' Claims.**

20         Defendants argue that all of Plaintiffs' claims fail because California Corporations Code

21  Section 1312 prohibits collateral suit for damages.  Defendants also argue that no exceptions to the

22  Section 1312 bar apply here, because Plaintiffs do not challenge the legality of the votes or seek

23  rescission of the sale.  In response, Plaintiffs argue that a non-statutory exception to Section

24  1312's bar is well-recognized, and that almost every case interpreting the statute has

25  acknowledged an exception where the plaintiff is unaware of all of the facts prior to the sale.

26  Plaintiffs dispute that they could have been aware of the withheld information given that it was not

27  disclosed.  Plaintiffs claim that they were unaware of the requirement for a fairness opinion at the

28

United States District Court
Northern District of California

time because they did not know that ArcSoft had more than 100 shareholders at the time of the buyout. They also argue that they do challenge the validity of the vote, and that Section 1312 authorizes a suit for rescission in the alternative.

### 1. California Courts Recognize a Non-Statutory Exception to the Bar for Fraudulent Concealment or Misrepresentation.

As one California court observed, "Section 1312 is not the most pellucid of statutes." *Busse v. United PanAm Fin. Corp.*, 222 Cal. App. 4th 1028, 1038, (2014). The statute provides, in part:

> No shareholder of a corporation who has a right under this chapter to demand payment of cash for the shares held by the shareholder shall have any right at law or in equity to attack the validity of the reorganization or short-form merger, or to have the reorganization or short-form merger set aside or rescinded, except in an action to test whether the number of shares required to authorize or approve the reorganization have been legally voted in favor thereof.

Cal. Corp. Code § 1312(a).

In *Steinberg v. Amplica*, 42 Cal.3d 1198 (1986), the California Supreme Court interpreted the scope of Section 1312 and found that the statute was intended to limit shareholder remedies in connection with mergers and acquisitions, including where the shareholders alleged breach of fiduciary duties by individual officers or directors. *Id.* at 1203-04. Nevertheless, the California Supreme Court left open the possibility that the statute would not bar a claim for damages if the defendants fraudulently concealed or misrepresented the terms of the merger. *Id.* at 1207. The court limited its ruling to the circumstances of "a minority shareholder who is aware of the facts underlying his claim of breach of fiduciary duty" prior to the merger. *Id.*

Defendants urge that an exception for fraud, if any, would be extremely narrow in application. Defendants point to *Singhania v. Uttarwar*, 136 Cal. App. 4th 416 (2006) as instructive. In *Singhania*, the plaintiffs were former minority shareholders of a target company, and defendants were former controlling shareholders, officers, and directors. *Id.* at 420. The plaintiffs alleged that defendants breached their fiduciary duties to plaintiffs by misrepresenting that the target company had already obtained shareholder approval for the merger, omitting the fair market value of the shares, and failing to disclose requested information regarding the value of

1 the shares and issuance of additional shares to themselves without consideration in order to inflate

2 their percentage of corporate ownership.  *Id.* at 434.  The Court of Appeal held that those

3 allegations did "not remove plaintiffs from the ambit of section 1312's bar" because the plaintiffs

4 were aware of defendants' obligation to state a fair market value for the shares and because

5 plaintiffs did not allege that the defendants were required to physically provide the information

6 sought by plaintiffs prior to the merger.  *Id.* at 430.  To the extent plaintiffs were entitled to the

7 information, they had a remedy under the right to inspect, which they chose not to exercise.  *Id.* at

8 431 (citing Cal. Corps. Code § 1601).

9       Unsurprisingly, Plaintiffs assert that this action is "nothing like" *Singhania*.  Plaintiffs

10 argue that the *Singhania* court expressly noted the exception for fraudulent concealment or

11 misrepresentations "regarding the nature of [the company's] business," 136 Cal. App. 4th at 433,

12 but had found that the plaintiffs in that action had not alleged either.

13       The Court agrees with Plaintiffs.  The *Singhania* court made the disclaimer:

14     We do not address whether an action for damages might be available where a shareholder
15     elects to exercise dissenters' rights but subsequently discovers the shares were purchased
    for less than full fair market value due to fraud or breaches of fiduciary duty, the facts of
16     which were unknown to the shareholder before the buyout. That factual scenario is not
    before us.

17 *Id.* at 434-35.  California courts repeatedly make reservations for fraud, indicating a reticence to

18 prohibit all actions for damages where officers and directors engage in fraud in the course of

19 corporate transactions.[9]

20       The Court agrees with Plaintiffs that California courts recognize a non-statutory

21 exception to Section 1312 in the event of fraud where the facts underlying the claims were

22 unknown to the plaintiffs at the time of the transaction.  This exception makes policy sense.

23 Adopting a wholesale exemption for claims against bad actors who intentionally mislead

[9] Plaintiffs also point to a recent unpublished state court decision applying the non-statutory exemption on a demurrer, *Max v. 8E6 Corp.*, 2022 WL 909907, at *12 (unpub. Cal. App. Mar. 29, 2022).  In that case, the court declined to apply the Section 1312 bar because the plaintiff alleged "that he would have exercised his dissenters' rights had defendants timely disclosed their misconduct." *Id.* (citing *Singhania*, 136 Cal. App. 4th at 434) (internal marks omitted).  Although unpublished decisions are not citable in California state courts, federal courts may consider their reasoning for their persuasive value. *Rios v. Cty. of Sacramento*, 562 F. Supp. 3d 999, 1021 n. 3 (E.D. Cal. 2021).

United States District Court Northern District of California

shareholders, so long as they do so in the course of a reorganization, could incentivize misconduct.

**2.      Defendants Have Not Demonstrated that Plaintiffs Had Knowledge of the Alleged Fraud Prior to the Buyout.**

The Court will begin its inquiry by considering the information available and unavailable to Plaintiffs.  The Court will also consider, as suggested by *Singhania*, what information Plaintiffs knew they did not possess at the time they consented to the merger.

The evidence shows that Plaintiffs possessed the following information as of the merger:

(1) Unaudited financials from 2016 showing an income of $6.14 million and a negative $29 million book value;
(2) The merger agreement;
(3) The Information Statement relating to the buyout, which disclosed that: (i) the buyer was controlled by Deng; (ii) the Board had not considered alternative buyers; (iii) Deng was the point of contact regarding the buyout; and (iv) audited financials were attached (when they were not);
(4) Oral warnings from Deng that ArcSoft was failing and that the buyout was the only way for Plaintiffs to recoup their investments[10];
(5) Knowledge that they had not received complete financial records from Deng or ArcSoft.

The evidence also shows that Plaintiffs did not possess the following:

(1) An independent valuation or fairness opinion;
(2) Detailed 2016 financials showing that most of the "total liabilities" presented to Plaintiffs were "deferred revenues";
(3) Audited 2016 financials from a Chinese firm showing a positive book value of $34.1 million and an operating margin of greater than 41 percent (as opposed to 13.7 percent);
(4) Quarterly financials for 2016 and the first two quarters of 2017;
(5) ArcSoft's revenue forecasts[11], expenses, and cash position;
(6) Disclosure that Deng had an agreement with other investors to purchase a stake in the post-buyout company and take the new company public;
(7) The number or identity of other shareholders of ArcSoft;
(8) Knowledge of ArcSoft's new contracts with first-tier Android mobile phone manufacturers.

If the omitted financials were the sole source of Plaintiffs' grievances, Plaintiffs' claims would likely be barred.  However, the Court considers the withholding of the financials in combination with the alleged oral misstatements, withheld forecasts and disclosure of new

---

[10] The parties dispute whether Deng made the alleged statements.  The Court reviews the evidence in the light most favorable to Plaintiffs for purposes of analyzing the Section 1312 issue because Plaintiffs are the nonmoving party.

[11] Considering the evidence in the light most favorable to Plaintiffs for this purpose only, the Court assumes the revenue projections were genuine forecasts.

United States District Court
Northern District of California

contracts, and Deng's agreement to sell a stake of ArcSoft to Huatai at a much higher price. A reasonable jury could find that Defendants misled Plaintiffs and prevented discovery of their claims prior to the buyout. In other words, Plaintiffs did not know what they did not know.

Defendants fail to show that Section 1312 bars Plaintiffs' claims.

### 3. Plaintiffs Challenge the Legality of the Vote.

Section 1312(a) expressly carves out a right to suit where the shareholder challenges the legality of the vote. Cal. Corp. Code § 1312(a) ("…except in an action to test whether the number of shares required to authorize or approve the reorganization have been legally voted..."). Plaintiffs argue that the exception to Section 1312 based upon the legality of the buyout vote applies here because Defendants did not provide a statutorily required fairness opinion. Plaintiffs further argue that the vote was illegal because the Information Statement used to solicit shareholders omitted material information, and so procured votes by fraud. This exception is contemplated by *Singhania*, where the court explained that "an action to test whether the number of shares required to authorize or approve the reorganization have been legally voted in favor thereof" under Section 1312(a) includes considering "whether there were adequate disclosures made in soliciting proxy votes." 136 Cal. App. 4th at 427 (quoting Friedman, Cal. Prac. Guide: Corporations (The Rutter Group 2005) ¶ 8:363, p. 8-63). Plaintiffs survive Section 1312 on this basis as well.

### 4. Section 1312(b) Authorizes Rescission.

Finally, Plaintiffs argue that Section 1312 does not bar their claims because Plaintiffs seek rescission of the merger transaction, and both parties in the merger were under common control. Plaintiffs contend there is no impracticability restriction on rescission claims in California. Indeed, the *Busse* court characterized rescission under Section 1312 as a "big, but wholly equitable, stick." *Busse v. United PanAm Fin. Corp.*, 222 Cal. App. 4th 1028, 1038–39 (2014).

Defendants in turn argue that the merger has been completed and cannot be unwound, citing *Monty v. Leis*, 193 Cal. App. 4th 1367, 1372 (2011) (finding "no reasonable likelihood" that rescission of merger could be done). Defendants also dispute that there was "common control" between the pre- and post-buyout entities.

33

Equity will not rescind a transaction where a return to the status quo is impossible, and where rescission would damage all parties. However, "[c]ommon control under subdivision (b) . . . is one of those times when the Legislature is willing to allow a little dice to be played over the survivability of a corporate reorganization." *Busse*, 222 Cal. App. 4th at 1049-50. The rescission provision protects the minority shareholders, not those who benefit from a self-interested transaction.

Neither side has fully developed its arguments related to rescission, which is pleaded in the alternative. Whether there was common control, and whether rescission is possible, remain questions for trial.

**E.      Genuine Issues of Material Fact Remain as to Causation.**

Defendants next argue that they are entitled to summary judgment on all claims because Plaintiffs cannot prove that any of Defendants' alleged misconduct proximately caused Plaintiffs' harm. Causation is an element of fraud, breach of fiduciary duty, and breach of contract claims. *See OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.*, 157 Cal. App. 4th 835, 860-61 (2007) (fraud); *Stanley v. Richmond*, 35 Cal. App. 4th 1070, 1086 (1995) (breach of fiduciary duty); *CSAA Ins. Exch. v. Hodroj*, 72 Cal. App. 5th 272, 276 (2021) (breach of contract).

Defendants argue that Plaintiffs cannot establish causation because (1) they were required to agree to the buyout by a drag-along provision in the Voting Agreement; (2) Plaintiffs could not have stopped the buyout had they tried; and (3) Plaintiffs cannot show they would have tried to stop the buyout or initiate an appraisal proceeding.

**1.      The Drag-Along Provision Does Not Bar Plaintiffs' Claims.**

Defendants argue that Plaintiffs waived their appraisal rights by agreeing to the "drag along" provision in the Voting Agreement. The drag-along provision states as follows:

4.1    Actions to be Taken. In the event that the Board approves a transaction or series of related transactions that qualifies as a "Liquidation Event" as defined in the Articles of Incorporation. . ., then each Shareholder hereby agrees with respect to all Shares which it own(s) or over which it otherwise exercises voting or dispositive authority: . . . (b) to vote. . . all Shares in favor of such Sale of the Company and in opposition to any and all other proposals that could reasonably be expected to delay or impair the ability of the Company to consummate such Sale of the Company; (c) to refrain from exercising any dissenters' rights or rights of appraisal under applicable law at any time with respect to such Sale of the Company. . . .

(Dkt. No. 210-20, Ex. R, at ¶ 4.1.)  The drag-along provision also includes a number of conditions precedent to its application.  As relevant here, the drag-along provision does not apply unless:

> (e)     Upon the consummation of such Proposed Sale, all of the holders of the same class or series of the Company's Preferred Stock or Common Stock will receive the same form and amount of consideration per share of such class or series of Preferred Stock or Common Stock, respectively, taking into account any liquidation preference to which the holders of Preferred Stock are entitled in accordance with the Company's articles of incorporation in effect immediately prior to the Proposed Sale, or if any holders of Preferred Stock or Common Stock are given an option as to the form and amount of consideration to be received, all holders will be given the same option.

(*Id.* at ¶ 4.2(e).)  The Articles of Incorporation define a "Liquidation Event" as follows:

> (B) the consummation of the merger or consolidation of this corporation with or into another entity (except a merger or consolidation in which the holders of capital stock of this corporation immediately prior to such merger or consolidation continue to hold at least 50% of the voting power of the capital stock of this corporation or the surviving or acquiring entity), [and] (C) the closing of the transfer in one transaction or a series of related transactions in which this corporation is a party to a person or group of affiliated persons (other than an underwriter of this corporation's securities), of outstanding securities of this corporation if, after such closing, such person or group of affiliated persons would hold 50% or more of the outstanding voting stock of this corporation. . . .

(Dkt. No. 210-39, Ex. KK, at ¶ 2(e).)

Defendants argue that, because the Board approved the buyout, and the buyout qualified as a "Liquidation Event," Plaintiffs cannot establish that Defendants' conduct prevented Plaintiffs from continuing on as ArcSoft shareholders or exercising their dissenters' rights.

Plaintiffs respond that condition precedent (e) forecloses the application of the drag-along provision because Deng alone had the option to roll his shares into the post-buyout entity, meaning that other shareholders of the same class of stock were not "given the same option." Defendants reply that Deng rolled his shares into Wavelet Capital Management Limited prior to the buyout, and Wavelet's shares were terminated "immediately prior" to the effective time of the buyout, so that Deng had no shares for which he could have received consideration.  (*See* Dkt. No. 210-37, Ex. II, at PLAINTIFFS 0002655.)  The Court notes that the buyout agreement defines "Rollover Shareholder" as Deng, and "Rollover Shares" as all shares of stock held by Deng prior to the filing of the merger agreement with the California Secretary of State.  (*Id.* at PLAINTIFFS 0002660.)

It is immaterial whether Deng as an individual or Wavelet as an entity had a unique

1    opportunity to roll the shares into the new entity; the end result is that one of the shareholders, be

2    it Deng or Wavelet, had an opportunity in the buyout that the others did not.  Thus, the condition

3    precedent was not met, and the drag-along provision does not apply.  *See Orlando v. Carolina*

4    *Cas. Ins. Co.*, No. 07-cv-0092-AWI, 2007 WL 2155708, at *5 (E.D. Cal. Jul. 26, 2007)

5    ("Performance of a duty subject to a condition cannot become due unless the condition occurs or

6    its non-occurrence is excused.") (quoting *R.J. Kuhl Corp. v. Sullivan*, 13 Cal. App. 4th 1589, 1601

7    (1993)).

8              **2.       Plaintiffs Do Not Need to Prove They Could Have Stopped the Buyout.**

9              Defendants also argue that, because Plaintiffs had only 13 percent ownership of ArcSoft at

10   the time of the buyout, and the buyout was approved by 94.6 percent of shareholders, Plaintiffs

11   cannot show that they would have stopped the buyout.  Defendants point out that Plaintiffs claim

12   to have not known the identity of other shareholders at the time of the vote, and that Plaintiffs

13   concede that they may not have been able to convince the other shareholders to vote against the

14   buyout.  In sum, Defendants theorize that, if Plaintiffs cannot make a showing that they could have

15   stopped the buyout even with perfect information, then Plaintiffs' alleged losses were not

16   proximately caused by Defendants' fraud.  In response, Plaintiffs argue that the burden lies with

17   Defendants to prove that shareholders would have ratified the buyout after full disclosure.

18   Plaintiffs also question whether shareholders could have approved the buyout, or if the buyout

19   would have been blocked because shareholders cannot vote in favor of an illegal purpose or to

20   exempt a wrongdoer from the consequences of his fraud.

21              The Court rejects Plaintiffs' attempt to shift the burden for one of the elements of its

22   claims to Defendants.  *See Pardini v. Unilever United States, Inc.*, No. 13-cv-01675-JSW, 2021

23   WL 8153616, at *3 (Sept. 27, 2021) (granting summary judgment where plaintiffs failed to

24   provide evidence of causation in fraudulent concealment claim).  However, the Court nevertheless

25   finds that Defendants have not met their burden, as movants, to demonstrate the absence of

26   evidence regarding causation.  Defendants conflate causation of the buyout with causation of

27   Plaintiffs' harm.  *Cf. Wilson v. Great Am. Indus., Inc.*, 979 F.2d 924, 931 (2d Cir. 1992) ("That the

28   causal nexus between the merger and the proxy is absent when the minority stockholder's vote

1    cannot affect the merger decision does not necessarily mean a causal link between the proxy and

2    some other injury may not exist.").

3          *Persson* is again instructive.  In that case, a California court held that a jury reasonably

4    found a causal nexus between concealment of information and damages because, if the plaintiff

5    had possessed full information, he would not have sold his shares in the corporation "when and at

6    the price at which he sold them."  125 Cal. App. 4th at 1166.  Similarly, here, a reasonable jury

7    could find that Plaintiffs would not have sold their shares in ArcSoft for the price and at the time

8    in which they did in the absence of fraudulent concealment of material facts.  The same is true for

9    the alleged missed opportunity to continue on as shareholders or to exercise their dissenters'

10   rights.  At a minimum, a fact issue exists as to whether, in the absence of alleged fraud,

11   Defendants could have consummated the buyout on the terms in which they did.

12          **3.     There Is a Fact Question Regarding Whether Plaintiffs Would Have Dissented
                      in the Absence of Defendants' Alleged Fraud.**

13          Defendants next argue that Plaintiffs would not have exercised their dissenters' rights even

14   with full knowledge because Chan "wanted a payday."  (Dkt. No. 210, at 37.)  Defendants point

15   out that Chan believed for years leading up to the buyout that ArcSoft was not providing sufficient

16   information relating to its financial performance, but that he never demanded more information.

17   Defendants also point out that Chan and the Plaintiffs did not request more information in

18   connection with the proposed buyout.  Plaintiffs respond with a declaration from Chan that he

19   would have instructed Plaintiffs to invoke their dissenters' rights if he had all material

20   information.[12]

21          Defendants have not met their burden to prove that Chan and the Plaintiffs would not have

22   invoked dissenters' rights if they had been aware of Deng's omissions.  Defendants assert that

23

24   _____

25   [12] Defendants contend that Chan's declaration is a sham affidavit, but they do not point to any
     testimony which the affidavit supposedly contradicts.  Sworn statements submitted in opposition
26   to evidence are only "sham affidavits" if they "flatly" contradict prior sworn testimony.  *See
     Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 267 (9th Cir. 1991) (holding that a district court
27   must make a factual determination that a contradiction in testimony is a "sham" in order to
     manufacture an issue of fact where there is none before excluding the declaration).  Defendants do
28   not provide evidence demonstrating a "flat contradiction" with prior testimony.  *See id.*  The Court
     declines to exclude Chan's declaration on this basis.

United States District Court
Northern District of California

1   Chan's failure to invoke dissenters' rights with the information in his possession at the time of the

2   buyout shows that Chan would not have invoked dissenters' rights with complete information.

3   This is an argument for the Court to accept an inference adverse to the nonmoving party, which it

4   may not do.  *U.S. E.E.O.C. v. Alia Corp.*, 842 F. Supp. 2d 1243, 1257 (E.D. Cal. 2012) (finding

5   genuine dispute of fact where parties submitted conflicting testimony).  Therefore, summary

6   judgment on this basis is improper.

7   **F.    Genuine Issues of Material Fact Remain Regarding All Parties' Performance Under
         the IRA.**

8
        A breach of contract claim has four elements: (1) the existence of a contract; (2) the

9   plaintiff's performance or excuse for nonperformance; (3) the defendant's breach; and (4)

10  resulting damages to the plaintiff.  *Oasis West Realty, LLC v. Goldman*, 51 Cal.4th 811, 821

11  (2011).  Plaintiffs seek summary judgment on the first and third elements of their breach of

12  contract claim.  Defendants cross-move for summary judgment on the basis that Plaintiffs cannot

13  prove the second element.

14      In California, contract interpretation is a question of law that may be decided by the Court

15  if the contract is unambiguous or if there is no conflicting extrinsic evidence as to its meaning.

16  *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir. 1983).

17  A contract is ambiguous when "two equally plausible interpretations of the language of a contract

18  may be made."  *Walter E. Heller W., Inc. v. Tecrim Corp.*, 196 Cal. App. 3d 149, 158 (1987).

19      The parties agree there is a contract.  Plaintiffs produced the written contract and testimony

20  from an officer of ArcSoft acknowledging the contract.  Accordingly, Plaintiffs' motion is granted

21  as to the first element for breach of contract.

22      The remaining elements are less straightforward.  Plaintiffs claim that ArcSoft breached

23  Section 2.1 of the IRA, which provides:

24      <u>Delivery of Financial Statements</u>.     The Company shall, upon request, deliver to each
        Investor. . . that holds at least 750,000 shares of Preferred Stock of the Company (either in
25      the form of Preferred Stock or Common Stock issued upon conversion thereof, and as
        appropriately adjusted for subsequent stock splits, stock dividends, combinations and other
26      recapitalizations) (a "Major Investor"):

27      (a) as soon as available, but in any event within one hundred eighty (180) days after the
        end of each fiscal year of the Company. . . an income statement for such fiscal year, a

28

balance sheet of the Company and statement of shareholders' equity as of the end of such year, and a statement of cash flows for such year, such year-end financial reports to be in reasonable detail, prepared in accordance with generally accepted accounting principles ("GAAP"), and audited and certified by independent public accountants of nationally recognized standing selected by the Company;

(b) as soon as available, but in any event within forty-five (45) days after the end of each quarter of each fiscal year of the Company, an unaudited income statement, statement of cash flows for such fiscal quarter and an unaudited balance sheet as of the end of such fiscal quarter, all prepared in accordance with GAAP. . .; [and]

(c) promptly following the end of each fiscal year of the Company, a current capitalization table of the Company.

(Dkt. No. 204-18, Ex. 14, at ARCSOFT0052864-65.)

Plaintiffs demonstrate that they held at least 750,000 shares of stock, and ArcSoft does not dispute this figure. Plaintiffs argue that they issued written requests to ArcSoft via an August 4, 2016 email to Deng and a November 4, 2016 email to ArcSoft's Corporate Secretary. ArcSoft does not deny receipt of the emails. ArcSoft offers instead that it complied with the provision by providing a shareholder report for 2014-2015 in response to Plaintiffs' emails, and Plaintiffs did not object to the completeness of ArcSoft's response. ArcSoft further contends it had no duty to perform because Plaintiffs did not perform first. ArcSoft argues that Plaintiffs did not submit their request in compliance with Section 3.5[13] of the IRA, which states:

All notices and other communications given or made pursuant hereto shall be in writing and shall be deemed effectively given upon the earlier to occur of actual receipt or: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed facsimile if sent during normal business hours of the recipient; if not, then on the next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All communications shall be sent to the respective parties at the addresses set forth on the signature pages attached hereto (or at such other addresses as shall be specified by notice given in accordance with this Section 3.5).

ArcSoft and Deng did not include an email on the signature page indicating that they would accept notice by email. Plaintiffs in turn argue that a "request" under Section 2.1 is not a "notice or other communication" subject to Section 3.5, or, alternatively, that ArcSoft waived compliance with Section 3.5.

The Court agrees with Defendants that "All notices and other communications given or

---

[13] The section is actually labeled 2.5, but this appears to be a typographical error. (*See* Dkt. No. 204-18, Ex. 14, at ARCSOFT0052869.)

made pursuant" to the IRA necessarily encompasses "requests" issued under Section 2.1. *See Adv. Thermal Scis. Corp. v. Applied Materials, Inc.*, No. SACV 071384 JVS JWJX, 2010 WL 2015236, at *33 (C.D. Cal. May 18, 2010) (holding "consultation" required by one section of contract was communication covered by "Any notice or other communication" language in notice section of contract). Chan's emails to Deng and Berryman did not comply with Section 3.5 because they were not addressed to "the addresses set forth on the signature page[]" of the IRA.

However, the Court finds that neither Plaintiffs nor ArcSoft have carried their burden to demonstrate the absence of an issue of material fact as to breach. None of the communications between the parties references the IRA. The parties discuss years of disorganization and informality that may imply waiver of some or all of the contested provisions. A reasonable jury could find that ArcSoft fully performed by providing some limited information in response, or that Plaintiffs waived their right to a complete response. A reasonable jury could alternatively find that Plaintiffs were not required to comply with Section 3.5 because of waiver.

## CONCLUSION

For the foregoing reasons, the Court rules:

- Defendants' Motion to Exclude the expert testimony of David M. Locala is DENIED.
- Plaintiffs' Motion for Partial Summary Judgment is GRANTED, IN PART, and DENIED, IN PART, as follows:
  - Deng owed Plaintiffs a duty to disclose material information in his control because he solicited shareholder action, and Deng breached that duty as a matter of law as to the 2017 quarterly financials. Questions of fact remain regarding whether Deng breached his duty as to the two February 2017 sets of 2016 financials, the projections, the recent "company wins," the agreement to sell a stake in the post-buyout company, and the agreement to take the post-buyout company public.
  - Plaintiffs have not met their burden to show that ArcSoft owed a duty to disclose material information in its control to Plaintiffs, or that ArcSoft breached any such duty.
  - Deng owed Plaintiffs a fiduciary duty to disclose material information in his

40

control as an officer of ArcSoft and in connection with soliciting Plaintiffs' consent to the buyout.  Whether Deng breached his fiduciary duty by failing to provide a fairness opinion is a fact question for the jury.

- o The Investor Rights Agreement is a contract between the parties.  Questions of fact remain regarding whether the parties performed or waived performance under the contract.

- Defendants' Motion for Summary Judgment is DENIED.

- o Questions of fact remain as to whether Plaintiffs had knowledge of the basis of their claims at the time of the buyout.

- o Questions of fact remain as to whether Defendant Deng made affirmative oral misstatements.

- o Questions of fact remain as to causation for all of Plaintiffs' claims.

- o Questions of fact remain regarding whether the parties performed or waived performance under the contract.

- At the Final Pretrial Conference, the parties should be prepared to discuss in detail their settlement efforts.  The parties should meet and confer prior to the Final Pretrial Conference regarding which settlement process the Court should order before trial.

**IT IS SO ORDERED.**

Dated: November 29, 2023

_____
JEFFREY S. WHITE
United States District Judge

41